## McKenzie v. The State.

MURDER—*Time of intent immaterial.*—Where the State proves beyond a reasonable doubt, that the accused perpetrated the murder, by lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing, it is murder in the first degree, and the *time* when the intent was formed to take life is not material, so it be shown the design thus formed was before the act of killing.

SANITY—*Burden of proof.*—The legal presumption is in favor of sanity, and the killing not being denied, but assumed to be excusable, the burden of proof is upon the accused, and if he fail, by sufficient evidence, to change the presumption raised against him by the killing, the jury being the judges of the weight of the testimony, the case would be legally adjudged against him.

RECORD—*Must show objections.*—Where the record fails to show that the defendant objected to the instructions given by the court, or that the court refused to give instructions asked by the defendant, the objection will not be heard here.

JEOPARDY.—When, after the jury has been selected and sworn, unauthorized separation and misconduct is satisfactorily shown, the court may quash the venire, discharge the selected jurors, and award a new venire; and the defendant will not be entitled to a discharge from sentence under the verdict found against him, by reason of being formerly put in jeopardy.

*When Attaches.*—Jeopardy cannot attach until the jury is duly impanelled, and all the machinery of the court fully organized.

DISCRETION OF COURTS.—In preliminary steps of a trial, a proper discretion may be exercised by any of the courts of original jurisdiction, which, if not grossly abused, will not be considered here.

IMPROPER INFLUENCE—*New Trial.*—When it is made to appear, to the satisfaction of the court, that what may have appeared to be an improper influence upon the jury, was not so in fact, the court should overrule a motion for a new trial, based on that ground.

*Appeal from Sebastian Circuit Court.*

HON. E. J. SEARLE, Special Judge.

*Du Val & King*, for appellant.

*Montgomery*, Attorney General, for appellee.

GREGG, J.

At the April term, 1867, the appellant was indicted, in the Fort Smith district of Sebastian county, for the murder of Charles W. Brown. In June following, the defendant was brought before the court, was served with a copy of the indictment, duly arraigned, a venire properly returned, and after more than half the requisite number of jurors had been selected and sworn, they were discharged for alleged misconduct on their part, the venire set aside and another venire ordered; the jury was therefrom selected and sworn, argument of counsel and charge of the court heard, and a verdict of murder in the first degree was returned against the accused. He moved the court for a new trial, because, as he alleged, the finding was contrary to law, and the instructions of the court. *Second*, It was contrary to the evidence. *Third*, It was contrary to law and evidence. *Fourth*, The court erred in refusing to give the jury the first and second instructions asked by the appellant. *Fifth*, The court erred in discharging eight of the jurors who had been sworn, and three who had been selected and not sworn. *Sixth*. Because the court pronounced Jackson Coffman a good juror, and after he had been selected by the State, discharged him before the appellant had accepted or rejected him. *Seventh*, Because one of the jurors, during the trial, received a note in writing from a bystander, without appellant knowing what was written on the paper.

The court overruled the motion for a new trial. Upon similar grounds the appellant moved in arrest of judgment, which motion was also overruled.

The appellant excepted, filed his bill of exceptions, setting out the evidence and instructions of the court, and prayed an

appeal to this court. The court below stayed the proceedings upon its judgment, and allowed a *supersedeas* to be entered, and forwarded a transcript to this court without granting the appeal.

After some delay the case was presented to this court, and when reached for determination a *procedendo* was awarded to the circuit court to grant the appellant an appeal to this court. At a regular term of that court, on the 21st of October, 1870, the defendant was brought before the court, and the prayer in his application for an appeal was granted, and a transcript filed in this court, the 27th of December, 1870.

The first ground set up in the motion for a new trial was not sufficient, as will appear from a discussion of the other causes.

· The second ground is, that the finding of the jury was not warranted by the evidence, the substance of which follows:

John Speet testified that he came to Noble's brewery, in Fort Smith, and McKenzie, the appellant, and Brown, the deceased, were sitting near each other at the door of the brewery. Brown said to McKenzie, "let us go home;" McKenzie called him a d–d son of a bitch, and told him to kiss (an indecent part of his person). Brown then said: "I do not wear any pistol." McKenzie said: "You are not able to wear any such things." McKenzie then put on his shoes and got up from his seat, inside the door, stepped back about two steps, raised his coat, drew a revolver from his side, and said: "You d––d son of a bitch, don't bother me any more," and shot Brown, who fell. Brown was then about three steps outside the door.

Mrs. Nobles testified that as soon as the pistol fired, she went into the brewery, and saw the man in the back room with a pistol in his hand, and saw the man lying dead out at the door.

Frank Wesley testified that he was near the brewery; saw Brown standing, and saw him fall and die, about three steps out from the door; did not see McKenzie any more until an officer had arrested him.

Mrs. Brown testified that she saw the accused and her husband, the deceased, on the 17th of June, 1867, near Fort Smith, on the Van Buren road, and in about three hours thereafter she saw the body of the deceased lying near Noble's brewery; that on the morning of the same day, she heard the accused tell deceased that he would kill him that day; that the accused then had no pistol, but about half an hour afterwards she saw him with a pistol and lead in his hand; that she and others came to town with accused and deceased, in a wagon, soon after dinner; she knew of no difficulty between the accused and deceased; they talked together on the road; the accused told deceased to shut his mouth, that he knew nothing, but she supposed they were joking.

Crawford testified that he knew the accused and deceased; saw them at Fishback's farm, where they lived, in the forenoon; they were playing, slapping each other and running around, and he heard the accused say, "I will kill him before night." McKenzie seemed to be drunk; saw him with a pistol; they started to town soon after dinner; in the evening he heard that Brown had been killed.

Other witnesses testified as to the killing, the wound, etc.; but the most material, for the prosecution, was the above alluded to.

All the witnesses showed that they knew of no previous quarrel between the parties.

The defendant introduced several witnesses. The first testified that the appellant was of singular habits or mind; another said he regarded him as very much broken down, physically and mentally; had not considered him in his right mind for ninety days, and not more responsible than a lunatic; that when drunk, he is different from other persons; never heard him say anything angry or vicious; he seemed prostrated; he went with one Taylor, and they were up much night and day.

The next witness testified that he was a graduate of Maryland University, and had practiced medicine twenty years; had

for several months known the accused, and he had concluded he was simple-minded; and, if talking to medical men, he would call him insane—not in the full sense of that term; he was of opinion he was imbecile to such an extent as at times to render him unconscious of any act, and that this imbecility was increased by the excessive use of intoxicating drinks; he was of opinion the accused would generally know the difference between right and wrong, and would be responsible for his acts; but it is probable, in his case, that the use of intoxicating drinks to any great extent would render him totally insane.

The next witness said he had practiced medicine, etc., seventeen years, and had known the accused six months, and he was of opinion his mind was very much impaired from some bad habits, or the commission of some crime, that had preyed upon his mind so as to produce mental imbecility; and that that would be greatly increased by excessive use of strong drink.

The next testified that he had seen freaks in the accused that made him think that he was not a man of sound mind; and again he had thought him a very intelligent man; he is a man of no sense when on a spree, no reason, or control of himself when under the influence of liquor; he saw him once when he was putting a band on a gutter, and told him he was not putting it on very straight; he made no reply, but picked it up and kissed it; and that witness went and told the foreman he was "a perfect luna." This was in March, 1867; the accused said but little when sober, and at such times he considered that he would know right from wrong.

Jackson Brooks testified that he saw the accused at the brewery; he was about the bar pretty much all day, and he saw him drinking "right smart;" thinks he was sober in the morning, but about three o'clock he was pretty tight; this was the 17th of June, 1867.

The next witness said, he came to town with the accused, and he took a glass of beer at the "Last Chance," and again

drank at the brewery, and was pretty drunk; this was the only time he ever saw him drunk.

The State then introduced a witness, who said he had for several months known the accused, and regarded him not very bright—hardly medium sense.

The next witness said he and the accused were both carpenters, and worked together in the government shop; had known him since December, 1866; was foreman over him, and could not say he ever thought he wanted sense; he was a good man and a good mechanic; that he knew the witness who said he told him, as foreman, that the accused was "a perfect luna," and did not remember of his ever having such talk to him.

The next witness said the accused had worked for him a month and a half, and he thought him an ordinarily sensible man.

The next witness said he was a carpenter; had frequently seen the accused; worked in the shop with him, and never saw any thing in him that indicated insanity.

The next witness stated the same.

The next said he had been with the accused every day for two weeks next before the killing, and saw no evidence of insanity.

The widow of the deceased then testified that she had never seen any indications of the accused being insane, and that about a week before the killing she heard the accused say if he were to commit murder he would claim to be insane, and when he got out of it he would be as smart as any of them.

We have thus, at length referred to the substance of the evidence, because the principal question here presented is as to the sufficiency of this evidence to sustain the verdict of murder in the first degree. The rule is well understood that where the State proves beyond a reasonable doubt that the accused perpetrated the murder by lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing, it is murder in the first degree. The intention is manifested by the

circumstances connected with the act of killing. Express malice is that which is capable of proof, and malice is implied when no considerable provocation appears, or when all the circumstances of the killing manifest an abandoned and wicked disposition, and this court has decided that the length of time is not material so that the killing was the result of a willful, corrupt and malicious intent to take life.   A design thus formed before the act of killing is sufficient. *Bivens vs. State, 11 Ark., 460, sec 2; Va. Cases., 483, and 6, Randolph (Va.), 121.*

There can be no question, leaving the insanity out of view, but that the evidence here shows a willful, intentional killing, and not only a want of considerable provocation, but without the slightest provocation.   Take the entire testimony and there is not the slightest word or act from the deceased towards him, in any way calculated to injure him or arouse his passions. On the other hand, there is some evidence going to show that he, before, and at the time of the killing, was harboring malice towards the deceased.   A settled intent to commit the most diabolical crimes may, and often does, remain secret until an opportunity offers to carry the wicked purpose into effect, and by concealing the malice, and cause of ill-will that exists, a wicked one can better hope to accomplish his purpose and escape punishment; hence it is wise for the law to presume that every one intends the first and natural consequences of his act.

In this case two witnesses testify to threats made on the morning before the killing.   One of these same witnesses testified that, a week before, the accused declared what he would do in case he should commit murder, and the fact of his preparing himself with a deadly weapon, immediatly after making the threats, his impolitic, if not insulting, words while going to Fort Smith, and the unprovoked attack and killing of the deceased, certainly well justified the jury in finding that the killing was willful, malicious and premeditated.

To refute this very violent presumption against him, the

prisoner attempted to set up that he was then insane, and not conscious of the act he did. .

The legal presumption is in favor of sanity, and that the party intended to do what was the natural consequence of his act, and if he made no denial of the killing, but assumed that he was excusable, he thereby took the burden of proof; and if he failed to produce evidence sufficient to change the presumption raised against him by the proof of the killing, the penalty of the law would be legally adjudged against him, and the jury is the only proper tribunal to determine the weight of the evidence, and this verdict certainly was not a finding without evidence.

It was by the physicians, and some others, testified that the accused was imbecile—a man of weak mind, and liable to be much affected from excessive use of strong drink; but while this may have been probable, even if it had been most likely, it is by no means conclusively shown that such result as an excusable insanity would follow from the free use of intoxicating liquors; and in that conflict of evidence the jury alone could determine.

If it had been shown that drunkenness would necessarily produce insanity in the accused, the proof is by no means conclusive that at the time of the killing he had been laboring under the influence of ardent spirits long enough, or to an extent sufficient, to produce that insanity.

One witness spoke of his drinking some the day before the killing, another supposed he was drinking in the morning before the killing in the afternoon; but one who had been with him for two weeks, except the previous day, said he was sober for that whole time. Different other witnesses testified that he was sober in the forenoon of that day, and when he came to town. Brooks testified that he, at the time of the killing, was drunk, or, as he termed it, "pretty tight;" that he had seen him about the brewery *nearly all day*, and had seen him drink. This statement is not well sustained by other witnesses. It was shown by a number of them that he

did not come to town until after noon, and that the killing was about three o'clock, and this made it quite clear that he was not there *nearly all day*, and that Brooks did not fairly state the facts. Except a glass of beer, no one else testified that he had been drinking after coming to town.

To place no stress upon the evidence tending to show he was sane, and, if not at the time, up to near the time of killing, and we do not see how the jury on either point—being drunk, or being insane, if drunk—could well have found in the accused's favor; and would it not endanger the rights of society beyond what the law will allow, to hold that any one who voluntarily beclouds his mind with intoxicating drinks may thereby be excused in taking the life of an innocent man? *See Bishop on Criminal Law, vol 1, secs. 494 and 499, and note 1.*

The third ground for a new trial is disposed of in the consideration of the second and fourth.

Upon the fourth ground, the law, as was given in charge by the court, is set out, and the record fails to show that the accused excepted to any of the instructions given by the court, or that the court did not give all the instructions asked by the defendant there, and the finding seems to be altogether consistent with the instructions.

The fifth cause for a new trial, if good, is one that was more applicable in arrest of judgment. After eight of the jurors of the original panel had been selected and sworn, unauthorized separation and misconduct was shown to the satisfaction of the court ; (it was shown, a witness in the case had talked to some of the jurors, etc.) whereupon the venire was quashed, and the selected jurors discharged, and a new venire awarded. The law scrupulously guards the rights of an accused in such cases, but in preliminary steps, a proper discretion may be exercised by any of the courts of original jurisdiction, which, if not grossly abused will not be considered here; and if in this case the misconduct of the jurors was such as would have required the court to set aside their verdict, had they remained and returned one, it was judicious to discharge them without

the labor and expense of a long trial; and, without evidence to the contrary, we will always presume such was the case—that a proper discretion was exercised. The defendant was not entitled to a discharge from sentence, under the verdict found against him, by reason of being formerly put in jeopardy of life, as held in the case of *Doctor T. Lee, v. the State*, decided at the present term. Such jeopardy cannot attach until the jury is duly impaneled and all the machinery of the court fully organized for trial and judgment. *Commonwealth v. Cook, 6 Story, 586; State v. Melville, 2 Georgia, 24; People v. McGowan, 17 Wend., 386; Cooly on Con. Lim., 326 and 327, and other cases there cited.*

The sixth objection was, that the court discharged a juror for cause, after the State's counsel had accepted him, and before the defendant had passed upon him. This was clearly within the discretion of the court. There can be no question as to the right of the court, if a juror is found to be incompetent, to discharge him at any time before he is accepted and sworn to try the case.

The last ground assigned for a new trial was, that a bystander, during the trial, handed one of the jurors a slip of paper with writing on it.

In cases of this magnitude it is highly improper to allow any communication made to jurors, not known and assented to by the defendant, except matters of vital interest to the jurors, and such only as are entirely disconnected with the case before them, and such communications should be by express permission of the judge, and in his presence, or that of a sworn officer.

It was held by this court, in the case of *Collier v. State, 20 Ark., 36*, that where it is made to appear to the satisfaction of the court, that what may have appeared to be an improper influence upon the jury, was not so in fact, the court should overrule a motion for a new trial. The record here shows that the court being fully advised of the matters and things in the motion, upon hearing the motion, found that the causes assigned were not sufficient to grant a new trial, and the record

shows a want of proof that an improper influence was had on the juror.

Upon the whole case, the appellant has failed to show that he was prejudiced by any ruling of the court.

The testimony shows a most wanton and unneccessary killing of a fellow man, and while his attempt to prove his own insanity at the time of the killing, was such as may have afforded him a hope of acquittal, yet it was strongly rebutted; so much so, as to remove any doubt that might have been raised as to his criminal intent and responsibility, and the jury having so decided, the judgment and sentence of the court below must be, and the same is, in all things affirmed.