# Commonwealth *v.* Albert Woodley, Appellant.

*Criminal law—Murder—Insanity—Charge of court.*

On the trial of an indictment for murder, where insanity is set up as a defence, it is proper for the court to charge that mental incapacity is to be established by the weight of the evidence, and that an act is presumed to have been done sanely until the contrary appears by the evidence.

An instruction that the prisoner should be held responsible for his acts
" until the fact is positively proved that he is not responsible," while
holding the defence to too high a measure of proof, is not injurious to
the prisoner where the court further says : " Are you satisfied : not clearly
but by the weight of the evidence simply, because he is not bound to
prove it, except by the weight of the evidence—the fair preponderance of
evidence ; " and where this rule is again stated and enforced in other
parts of the charge.

Argued Jan. 14, 1895. Appeal, No. 29, Oct. T., 1895, by
Albert W. Woodley, from judgment of O. & T. Allegheny
Co., June T., 1894, No. 13, on verdict of guilty. Before STER-
RETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN
and FELL, JJ. Affirmed.

Indictment for murder. Before SLAGLE, J.

The court charged in part as follows :

" Has the commonwealth, by its testimony, established that
the crime has been committed by the prisoner at the bar ; and
if so, then what is the crime committed ? There was no third
person present at the time that this fatal shot was fired, so far
as the commonwealth has shown. They have shown that on
the morning of the 9th day of May, 1894, the defendant came
to the house of Mr. McConnell, the father of the deceased ;
that there were no persons in the house at the time except
Mr. McConnell ; his daughter, Mrs. Buchanan, and the defend-
ant. After some time, fixed as about three quarters of an hour,
the defendant went from the front room of the house into the
dining-room, and from the dining-room into the kitchen, where
the deceased was at work, and that immediately afterwards,
within a minute or two, Mr. McConnell heard a shot ; went
from the front room into the next one, when he heard a sec-
ond shot, and then passed into the kitchen and found defend-
ant and his daughter, Mrs. Buchanan, lying upon the floor.
No other person was in the kitchen at the time.

" Mrs. Buchanan died without having made any statement
as to what occurred, so that, as far as the evidence is concerned,
we are in entire ignorance of the circumstances attending this
killing.

" The defendant was found upon the floor with a pistol wound
in his head, and apparently unconscious, and was taken from

there to the Allegheny General Hospital, where he was treated, and where, a short time after he arrived there, if not before, he became conscious. [You have the testimony of a number of witnesses who said that immediately after his returning to consciousness, upon inquiry, he said, 'I did it,' but gave no excuse for the act except by saying that it may have been from jealousy. This is the testimony of the commonwealth as to the killing.] [1]

"Now the commonwealth have offered some evidence upon this point. [In the first place they call attention to the fact that the defendant purchased this pistol the day before the crime was committed, or this killing was perpetrated. If the pistol was purchased for this purpose, it would be a very strong indication of not only a willful act, but of a deliberate and premeditated act, because if he thought of doing it on Tuesday and continued to meditate and deliberate upon it until Wednesday morning, it would certainly be full time for all the deliberation and premeditation that the law could require.] [2] [In the further evidence of that, they claim that before the act was committed, the defendant had passed in and out through the house two or three times, and that immediately before it was committed, he closed the doors as he went from the front room to the dining-room, and from the dining-room to the kitchen, so that both doors were closed between the kitchen and the dining-room and the dining-room and the parlor, and that that is evidence of a purpose and a fixed determination to do what was done deliberately.] [3]

"[You will take all of these matters into consideration, and if you are satisfied from the evidence beyond any reasonable doubt (which means that you shall be fully satisfied, so that your minds shall rest easily and certainly) of the fact, then that testimony of the commonwealth would justify you in finding the defendant guilty of murder in the first degree.] [4] If you have doubt upon any one of these prerequisites, you should give the prisoner the benefit of that doubt.

"[I have gone over the testimony of the commonwealth in this view because the defence in this case does not, as I understand it, contradict any of the facts which were proved by the witnesses on the part of the commonwealth, most of whom I have referred you to, and if there are any others, either one way

or the other, of course you will take notice of them.    I have merely run over them in a general way.] [5]

"The defence is that the prisoner, at the time this offence was committed, was not responsible for his act, or, at all events, was not in a condition to commit the act under circumstances which would make it murder of the first degree.    This, as I said, is the defence, and therefore you must take the testimony offered by the commonwealth and ascertain first if the crime has been fully established as having been committed by the defendant and what the degree of the crime is, and then ascertain how that testimony is affected by the testimony of the defence as to his condition at the time this offence was committed.    It was alleged that the defendant was insane, and you heard the testimony upon that subject.    [It seemed to me that the testimony upon the question of insanity was very meager.    The testimony of his sister was that after the death of his wife, a year or more before this unhappy affair, he became very despondent and seemed to be changed in some respects ; that he had been of a very kind disposition, and would still be kind at times, but at other times was cross ; that he would sit for hours doing nothing, or walk up and down the floor restlessly ; that he showed unkindness towards his mother, to whom he had always been very kind before.    That was a year or more before this trouble.    From that time up to the time, or within a few days of the commission of this offence, there is very little evidence.    One or two of his fellow workmen said that he acted queerly ;] [6] that there were times when he would not speak, or speak very little for a day at a time, but no one ventured the opinion that he was insane or irresponsible.    The fact is that he engaged in work all that year, except when he was idle for want of employment, and prosecuted the ordinary affairs of his life, and the witnesses who boarded with him said he was a very pleasant man.    They made no allusion to his being out of his mind.    I believe there were only one or two witnesses who said they thought he was 'a little off' at times.    However, you have all of that testimony.

"In order to relieve him of the responsibility of this offence, if you find that he committed it, the condition of mind existing at the time the offence was committed must be shown, and even if any degree of insanity was shown by that evidence, the

question would be for you, whether or not it was followed up to the time of the commission of the offence, and had an influence in inducing his action.

"The other ground of defence is of the same character to some extent; that is, intoxication, or insanity produced by intoxication, and upon that question, you have the testimony on both sides.

"There was no evidence offered by the commonwealth upon the question of insanity, the district attorney stating in his argument that he did not consider that there was any evidence of insanity, but upon the question of intoxication, testimony was offered upon the part of the defendant and also upon the part of the commonwealth, and that you must weigh, because it is a defence. It is incumbent upon the defendant to show you that that condition of things existed in order to relieve him from the consequences of his action. You heard his testimony; that on the Monday night preceding this killing having been thrown out of employment, he commenced to drink and that he drank that night very heavily; that on Tuesday morning he got up and left the house without eating his breakfast and commenced to drink again and continued to drink during that day; that he went to the house of Mrs. Buchanan in the morning and there made arrangements with her to go to the park in the afternoon and that they did go to the park but that he was so intoxicated that he did not know where he was; did not know how he got there; did not know whether he walked or rode; did not even know where he had met Mrs. Buchanan and Mrs. Johnston, and did not know anything at all until towards evening, when he found himself lying on a bench in the park with his head on Mrs. Buchanan's lap; and after that, he took her home in the evening and then continued to drink; that he went to his room, buying a half pint of whisky before he went, which he drank in the morning, and then, after taking four or five drinks at one saloon and two or three at another, he went to Mrs. Buchanan's house and this thing occurred. [He gave you a succinct statement of what he did up to the time of his going out to the kitchen, a few minutes before this shooting occurred.] [7] Then you have the testimony of the officers and the physicians at the hospital as to what he said when he regained consciousness after this thing did occur. The defend

ant says he did not know that the offence had been committed at all; that he had no knowledge of that occurrence. Now, though intoxication merely is not an excuse for crime, if a man is so intoxicated; that is, if his mind is so thoroughly unhinged that he does not know what he is doing, it seems to me that that would excuse him entirely; he would have no responsibility whatever. It may be, however, that it may have less effect than that; that is, a man may still be responsible for his crime and not capable of the deliberation and premeditation necessary to constitute a willful intent, and you will have both of these things to determine. Upon that subject, I will read to you again from the same judge, though in a different case, in which he has given the law on this question very clearly. In this case, the question was whether or not a reasonable doubt of a man's sanity would work an acquittal.

" So that you see that in the first place, it is the duty of a defendant relying upon insanity or intoxication to prove the fact that such condition existed at the time the offence was committed. As I have said, there is very little proof of insanity in this case, and you would scarcely find that there was a natural insanity existing of the degree necessary to acquit a man of crime, as described by the authority just read to you. [The question of intoxication depends almost wholly upon the testimony of the defendant himself. He tells you that he was entirely oblivious to everything that occurred during the time in which this killing was done though he knew before and after. He also says that he was entirely oblivious to what occurred during a part of the previous day. In addition to his evidence, one or two other witnesses testified that he acted queerly the night before the killing. They were the two men who boarded at the same house, and into whose room he went before going to bed. The commonwealth have met this by the testimony of Mrs. Johnston, who contradicts him as to his condition on Tuesday, and by that of three or four persons who saw him on Wednesday immediately before this occurrence, all of whom said that they saw no evidence of drunkenness or intoxication of any sort.] [8]

" The first question then for you to determine is: Is there evidence? Are you satisfied; not clearly but by the weight of evidence simply, because he is not bound to prove it except

by the weight of evidence; the fair preponderance of evidence; but it is his duty to establish the fact of intoxication or insanity by the weight of evidence. The burden of proof as to that is upon the defendant. Unless satisfied of that, then you rely upon the testimony of the commonwealth showing the crime as it has been detailed. But, as I have said, if you find that there is no evidence of intoxication at all; if you do not believe the testimony produced by the defendant as to his intoxication, then you would have to rely upon the testimony of the commonwealth throwing his out entirely. But if, to your minds, there is evidence of intoxication, then you are to determine whether or not that exonerates him wholly from the crime and relieves him from all responsibility, or whether it was such as only to affect the degree of the crime. And as to that, we again have an opinion by the same learned judge from whom I have read before. [Referring to LEWIS, C. J.] It was partly read to you by the counsel for the defence, but I will read the whole of this section.

" Thus we must perceive, that at the bottom of all that has been said on the subject of murder in the first degree, is the frame of mind in which the deadly blow is given—that state of mind which enables the prisoner either to know and be fully conscious of his own purpose and act, or not to know. Why is insanity a defence to homicide? Because it is a condition of the mind which renders it incapable of reasoning and judging correctly of its own impulses, and determining whether the impulse should be followed or resisted. Intelligence is not the only criterion, for it often exists in the madman in a high degree, making him shrewd, watchful, and capable of determining his purpose, and selecting the means of its accomplishment. Want of intelligence, therefore, is not the only defect to moderate the degree of offence; but with intelligence there may be an absence of power to determine properly the true nature and character of the act, its effect upon the subject, and the true responsibility of the actor; a power necessary to control the impulses of the mind, and prevent the execution of the thought which possesses it. In other words, it is the absence of that self-determining power, which in a sane mind renders it conscious of the real nature of its own purposes, and capable of resisting wrong impulses. When

this self-governing power is wanting, whether it is caused by insanity, gross intoxication or other controlling influence, it cannot be said truthfully that the mind is fully conscious of its own purposes, and deliberates or premeditates in the sense of the act describing murder in the first degree. We must, however, distinguish this defective frame of mind from that wickedness of heart which drives the murderer on to the commission of his crime, reckless of consequences. Evil passions do often seem to tear up reason by the root, and urge on to murder with heedless rage. But they are the outpourings of a wicked nature, not of an unsound or disabled mind. It became necessary, therefore, to inquire upon the evidence in this case, whether the prisoner was really able to deliberate and premeditate the homicide."

" So, gentlemen of the jury, you will, in this case, take the evidence of the commonwealth showing that the homicide was committed, and the surrounding circumstances; then it is for you to determine, as I have said before, whether or not that act was done by the defendant. You will then find whether it was lawful or unlawful. If unlawful, it is presumed to be malicious, and presumed to be murder. If you find it so, you will then determine whether or not the evidence of the commonwealth satisfies you that it was done under circumstances of deliberation and premeditation, and willfully. If so, and there was no excuse, he would be guilty of murder of the first degree. If you are not satisfied of the deliberation, premeditation and willfulness of the offence, then he would be guilty of murder of the second degree, unless you find that, at the time the act was committed, he was in a state of mental incapacity, produced either by natural causes affecting the mind, or by intoxication; and then you will consider the extent of that intoxication, if you believe any existed; whether it was such as to prevent him from knowing that he committed the act at all, or if it was such as prevented him from deliberating and premeditating upon this offence and forming the willful intent which is necessary to constitute murder of the first degree."

Verdict of guilty of murder in the first degree, upon which judgment of sentence was passed.

*Errors assigned*, among others, were (1–8) portions of charge

as above, and (11) in strongly stating and enforcing the evidence of the commonwealth bearing against the defendant, and only referring to the defendant's theory and evidence in a slight and disparaging way, in stating and restating the aspect of the law unfavorable to the defendant.

*Thomas M. Marshall, Rody M. Marshall* with him, for appellant, cited: Com. v. Silcox, 161 Pa. 499; Com. v. Gerade, 145 Pa. 289; Tiffany v. Com., 121 Pa. 180.

*Clarence Burleigh,* district attorney, for the commonwealth.

OPINION BY MR. JUSTICE FELL, March 4, 1895:

The appellant was convicted of murder of the first degree. The testimony and his admissions leave no doubt of his guilt. The killing and the motive which prompted it were clearly established. The only grounds of defence were insanity and intoxication. There was no evidence of either which would have justified a verdict in his favor, or a finding reducing the degree below that of which he was convicted. He had a full, fair and impartial trial.

The first eight assignments of error relate to the parts of the charge in which the testimony was referred to and its bearing and effect pointed out. We see no reason to doubt the accuracy or impartiality of what was said. These comments were fair to the commonwealth and to the prisoner, and they were necessary to the proper submission of the case. The prisoner had made the facts which indicated his guilt and led to his conviction. The conclusions to be drawn from them were so clear and irresistible that any reference to them was an argument against him; but no undue prominence was given in the charge to the commonwealth's testimony, and that in his favor, intended to excuse or lessen the degree of his crime, was treated with entire fairness. The qualifications to the affirmative answers to the second and fifth points correctly stated the law, and it was eminently proper that they should have been made. They were in effect an instruction that mental incapacity is to be established by the weight of the evidence, and that an act is presumed to have been done sanely until the contrary appears by the evidence. These were explanations proper to be made in connec-

tion with the affirmance of the points. They did not tend to weaken the effect of statements of the law in the prisoner's favor, to which he was entitled, but to make the points tell the whole truth and not a part of it only. Mental capacity and sanity are to be presumed as normal conditions, and the presumption stands until overcome by fairly preponderating evidence.

Our attention has been called to a sentence in the charge, which is not however assigned as error, in which it is said that the prisoner should be held responsible for his acts "until the fact is positively proved that he is not responsible." This held the defence to too high a measure of proof, as was pointed out in Commonwealth v. Gerade, 145 Pa. 289. The proper rule was given to the jury later in the charge when it was said : "Are you satisfied : not clearly, but by the weight of the evidence simply, because he is not bound to prove it except by the weight of evidence : The fair preponderance of evidence." This rule was stated and enforced in other parts of the charge, and the language referred to not being the subject of an assignment of error need not be noticed further than to say that it is manifest that it did no injustice to the prisoner. The case was submitted in a charge which fully and accurately reviewed the testimony and stated the law applicable thereto. The assignments of error are not sustained.

The judgment is affirmed and the record is remitted for the purpose of execution.