[No. 4931.    Decided April 4, 1904.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES CLARK, *Appellant*.[1]

JURORS—EXAMINATION AS TO GENERAL QUALIFICATIONS—WAIVER BY FAILING TO CHALLENGE. In a criminal prosecution it is not error to require the attorney for the state to examine the jurors as to their general qualifications, since the statute providing therefor is simply declaratory of the rights of the parties, and either side may waive the qualifications, and cannot take advantage of

[1]Reported in 76 Pac. 98.

any disqualification unless the juror is challenged for the specific cause, and exception taken.

CRIMINAL LAW—HOMICIDE—INSTRUCTIONS AS TO DEGREES OF OFFENSE—REPETITION. It is not error to repeat instructions defining murder in the first and second degree, as tending to intensify the crime as murder, where the repetition consisted in giving several instructions requested by the defendant which more fully pointed out the distinction between the different degrees.

SAME—INSANITY AS DEFENSE—BURDEN OF PROOF UPON DEFENDANT—INSTRUCTIONS AS TO REASONABLE DOUBT. In a prosecution for murder, where the defense is insanity, the burden is upon the defendant to establish the defense by a preponderance of the evidence, and hence it is proper to refuse to instruct the jury that they may acquit if they entertain a reasonable doubt as to the sanity of the defendant.

SAME—INSTRUCTIONS AS A WHOLE SUBMITTING DEFENSE OF INSANITY. It is not error to instruct the jury to convict if they find beyond a reasonable doubt that defendant committed the crime as charged in the information, in that it eliminated the defense of insanity, where other instructions fully and fairly instructed the jury upon such defense, since all the instructions must be read together.

TRIAL—INSTRUCTIONS—GENERAL CHARGE. It is not error to refuse requested instructions which are covered in the general charge.

HOMICIDE—EVIDENCE—SUFFICIENCY. The evidence is sufficient to warrant a conviction of murder in the first degree where the circumstances were such that there is no possible doubt that the defendant did the killing, although no one saw it, and the motive of jealousy is shown, and where there is no evidence of insanity (defendant's only defense), except his own statements to the effect that he did not know what he was doing, and the statements of two or three witnesses that he "looked wild" and as though he was "going to get on a drunk."

Appeal from a judgment of the superior court for Thurston county, Linn, J., entered June 12, 1903, upon a trial and conviction of the crime of murder in the first degree. Affirmed.

*Israel & Mackay,* for appellant.

*Frank C. Owings,* for respondent.

MOUNT, J.—Appellant was convicted of the crime of murder in the first degree, and sentenced to death. From this judgment he appeals.

The facts are briefly as follows: On January 20, 1903, the appellant, Charles Clark, and Leila Page were living together in a house of prostitution in the city of Olympia. Leila Page was the mistress of the house. They, had been so living for about a year. On the date named appellant and Leila Page, at about 4:30 o'clock in the morning, retired to their bedroom. They had both been drinking and she was sick. During the day and night of the 19th of January, they had been quarreling on account of the intimacy existing between Leila Page and one Nate Kirkendall. Appellant had threatened her life. Soon after they retired to their room, Leila Page requested Cleo Reynolds, an inmate of the house occupying the next room, to order a lunch for her. The lunch was ordered over the telephone to be brought from a near-by restaurant to the room occupied by appellant and Leila Page. When the waiter brought the lunch on a tray, Leila Page was lying on the bed with her face from the door and with all her clothes on, apparently asleep, breathing heavily. Appellant was standing in the middle of the room with his coat, vest, and hat off. He took the tray and placed it on the floor and said to the waiter that he had no money. He called to Cleo Reynolds, and asked her to pay for the luncheon. The waiter thereupon left the room, and the door was bolted after him from within. Cleo Reynolds paid for the luncheon, and the waiter went away. Cleo Reynolds went back to her room and soon fell asleep. She heard nothing more until about 8:30 o'clock in the morning, when she was awakened by the appellant calling her in a muffled voice.

She thereupon got up and went to the door of the room occupied by the appellant and Leila Page, but the door was fastened and she could not get in. She could hear appellant speaking her name. She thereupon asked him to open the door. After a short time appellant succeeded in unbolting the door, which was opened, and appellant fell across the open doorway, striking his head against the door jamb. His hands and face and clothes were covered with blood. He was apparently unconscious. He was dressed as above stated. Leila Page was lying on the bed, dead. All her clothes were on, as above described. Her forehead had been crushed, as with the back of an ax, and a long gash was cut across her throat from about the center of the neck to the right ear. Appellant had several cuts in his neck and throat and on his head. His mouth was burnt as if with carbolic acid. There was no evidence in the room of any struggle. An ax, a small pen-knife covered with blood, and a small bottle containing carbolic acid were found in the room. A carving knife was also found under the cover of a settee. Before appellant was taken from the scene he was told by a policeman that he was going to die, and was asked who did the killing. He at first said he did not know. Upon being asked if he was sure, "said he thought Nate did it." Appellant was thereupon taken to a hospital, and soon recovered from the effects of his wounds. In June, 1903, he was put upon trial under an information charging him with murder in the first degree. His defense was insanity. His version of the affair is as follows, quoting from the record:

"Q. Now, I will direct your attention to the night before she died—Sunday night, and I will ask you to start from that point and detail everything that you did, as you remember it, in connection with Leila Page, or

regarding her, and everything that was done that night, and the next day, describing your conditions and feelings during that time.   Just tell the jury all about it.   A. Well, Sunday night I went down to the house about midnight and she was not there.   The girls said she was over to the 'Star.'   Q.   What did you do?   A.   I went to bed and went to sleep, and she came in some time in the morning, I think, along about three or four o'clock. I do not know just what time.   She said something— I don't know what she said.   And then she put on her clothes and went out, and I don't know where she was going or where she went.   Then I went back to sleep. The next morning I got up about noon.   She was not in bed, and I looked in the other rooms and she was not there, and I asked Cleo if she had seen her and she said, no. I went down to the wine closet and got a drink of brandy and went to eating my breakfast and went up town. I went to Frank Dickerson's saloon—I was working there, and I asked Frank if he had seen her and he said he had not.   The night before I asked him—I opened up the games we were working at and went to work.   I thought I would wait until evening, but I could not wait.   I felt pretty nervous and went out to the bar and got a drink of brandy.   Then I thought that Nate roomed at the Union block and she might be up there.   I asked the butcher if he had seen her that morning and he said that he had, that she had been there and went on up toward Swantown.   I walked over as far as the Union block and then I walked up and down in front of the Union block a few times.   I thought I must be mistaken and went back to the house.   I went back to the house and they said she had been there and gone out again.   I went back.   I don't know how many times I made the trip.   It seemed like a dream.   I couldn't get any information.   I finally went to the Union block, but I don't remember going to the Union block twice.   I remember going to Mrs. Hubbard's and finally Mr. Wentz came in with the tray in the room where she was, Cecil Knight's room, and she was lying there on the bed; and I tried to rouse her and told her to get up, and I had her by the shoulder and she hit my

hand and my finger nail scratched her neck; I don't re-
member what was done or what was said either, but we
went home together. She told me she had been at the
Union block the night before with Nate Kirkendall. I
asked her if she intended to leave me and she said she
didn't. Then we embraced and I kissed her several times
and I went down stairs and she went down stairs and
left the house. She went over to the 'Star,'—I guess it
is the 'Wigwam' now. And I went over and asked if
she was there and they said she was not. I went back
to the house again and telephoned over after a little
while and they said she was not there. I sent Cleo out
to look for her and she came back and said she was over
there and wanted me to come over for her. I was not
drunk then and hadn't been drinking any time during
the day. I have been drunk and I know what the feel-
ing is. I don't say that the statements made by the wit-
nesses is not so, aren't true and didn't happen. If they
did happen I have no recollection of it. We went up-
stairs to go to bed. She told Cleo to order some lunch.
I remember that quite well. I went into the room, I
didn't know where she was at that time, and I started to
undress myself. I don't remember the boy bringing the
tray in or who let him in—I don't remember anything
of that. Then again I was lying in the hall, and then
again I was being carried out, and then again some one
poking something down my throat, and then again I came
to and found myself lying in a strange bed just like a
person would wake up out of a dream."

This is the substance of the evidence on the part of the
defense. Other facts necessary to an understanding of
the points presented will be stated hereafter. Appellant
insists, first, that the court erred in not requiring the at-
torney for the state to examine the jurors as to their gen-
eral qualification. It appears that the individual jurors
were examined first by the prosecutor for actual and im-
plied bias, and passed for cause; that thereupon they were
examined by counsel for appellant. After the state had

exercised all its peremptory challenges, and the appellant all of his peremptory challenges but one, and had waived that one, appellant objected to the whole panel upon the ground that the prosecutor had not examined the jurors as to their general qualification. This objection was overruled by the court. Counsel argues that, because the statute provides that no person is competent to act as a juror unless he is, (1) an elector of the state; (2) a male inhabitant of the county for the year next preceeding the time he is called; (3) over twenty-one years of age; (4) in possession of all his faculties and of sound mind; (5) able to read and write the English language; and (6) has never been convicted of a felony (§ 5939 Pierce's Code); and because it is provided that, "the jurors having been examined as to their qualification, first by the plaintiff and then by the defendant, and passed for cause, . . . " (§ 601, Pierce's Code), it is therefore the duty of the prosecutor to examine the jurors as to their general qualifications. While it is true that persons, not possessed of the qualifications named in § 5939, *supra,* are incompetent under the statute, it does not follow that the prosecutor may not waive his right to examine the jurors, and also waive the disqualifications named. The statute relating to the examination is simply declaratory of the rights of the plaintiff and of the defendant. Either may waive his right to qualify or disqualify the jurors. That this is true is manifest because of the provision of the next section, which is as follows:

" . . . but no act of a grand or petit jury shall be invalid by reason of such person or persons aforesaid, qualified in other respects, serving thereon; nor shall any disqualification of any member of a grand or petit jury affect the indictment or verdict, unless the juror for that specific cause was challenged or excepted to before the

finding of the indictment or rendition of the verdict, and the challenge or exception overruled, and error specifically assigned, . . ." § 5940, Pierce's Code.

In this case the appellant was not denied the right to examine the jurors as to their general qualifications. He had the opportunity, and failed or refused to exercise it. He simply insisted that the prosecutor should make the examination. It does not appear here that any of the jurors were in fact incompetent or disqualified under the statute. But, even if it did so appear, appellant, under the provisions of § 5940, *supra,* could not take advantage of that fact unless the juror was challenged for the specific cause, the challenge overruled, and an exception taken. It was, therefore, not error for the court to deny the appellant's request.

Appellant next insists that the court erred in repeating the instructions defining murder in the first and second degrees, because by so doing the court intensified the crime as being murder. We think no such result could be inferred. Both plaintiff and defendant prepared instructions in the case, and requested the court to give the same. After reading those prepared by the prosecution, which fairly covered the case, the court gave several instructions requested by the defendant, among which were two paragraphs defining murder in the first and second degrees, which clearly and more fully pointed out the distinction between those two degrees of murder than the definitions already given. While it would not have been error to have refused these instructions, they were given by the court, no doubt, for the purpose of pointing out to the jury more clearly the distinction between these two degrees of murder, so that the jury might not be confused therein. This was manifestly the object of the court, and we are clearly of the opinion that the

jury could not have been led to believe therefrom that the court intended to, or did, convey to the minds of the jurors his idea of the case. There was, therefore, no error in this.

Appellant next insists that the court erred in refusing to give to the jury the following instruction:

"It is not necessary in order to sustain the plea of insanity that the fact of insanity be established by a preponderance of the evidence; but if, upon the whole evidence, the jury entertain a reasonable doubt as to sanity they must acquit;"

and in giving an instruction upon the question as follows:

"You are instructed that every man is presumed to be sane and to intend the natural and usual consequences of his own acts. As the law presumes a man to be sane until the contrary is shown, I charge you that the burden of proving insanity as a defense to a crime is upon the defendant to establish by a preponderance of the evidence, and unless insanity is established by a fair preponderance of the evidence the presumption of sanity must prevail."

This raises the principal question in the case and the one upon which the appellant apparently relies. Able counsel upon both sides have exhaustively treated the subject in their briefs, and brought to our attention adjudicated cases from nearly all of the states of the Union, and from the supreme court of the United States. The rule contended for by the appellant is sustained by the supreme court of the United States, and by the highest courts of the following states: Florida, Illinois, Indiana, Kansas, Michigan, Mississippi, Nebraska, New Hampshire, New York, Tennessee, Vermont and Wisconsin— in the latest cases cited, as follows: *Davis v. United States,* 160 U. S. 469, 16 Sup. Ct. 353, 40 L. Ed. 499; *Armstrong v. State,* 30 Fla. 170, 11 South. 618, 17 L. R. A. 484; *Jamison v. People,* 145 Ill. 357, 34 N. E. 486;

*Plake v. State,* 121 Ind. 433, 23 N. E. 273, 16 Am. St. 408; *State v. Nixon,* 32 Kan. 205, 4 Pac. 159; *People v. Finley,* 38 Mich. 482; *Ford v. State,* 73 Miss. 734, 19 South. 665, 35 L. R. A. 117; *Furst v. State,* 31 Neb. 403, 47 N. W. 1116; *State v. Jones,* 50 N. H. 369, 9 Am. Rep. 242; *Moett v. People,* 85 N. Y. 373; *King v. State,* 91 Tenn. 617, 20 S. W. 169; *Revoir v. State,* 82 Wis. 295, 52 N. W. 84; while the highest courts of the following states maintain the rule that, where insanity is set up as a defense in a criminal case, it must be established by a preponderance of the evidence: Alabama, Arkansas, California, Connecticut, Delaware, Georgia, Idaho, Iowa, Kentucky, Maine, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, New Jersey, Ohio, Pennsylvania, South Carolina, Texas, Utah, Virginia and West Virginia—in the cases cited as follows: *Parsons v. State,* 81 Ala. 577, 2 South. 854, 60 Am. Rep. 193; *McKenzie v. State,* 26 Ark. 334; *People v. Hettick,* 126 Cal. 425, 58 Pac. 918; *State v. Hoyt,* 46 Conn. 330; *State v. Cole,* 2 Pennewill (Del.), 344, 45 Atl. 391; *Ryder v. State,* 100 Ga. 528, 28 S. E. 246, 38 L. R. A. 721, 62 Am. St. 334; *State v. Larkins,* 5 Idaho 200, 47 Pac. 945; *State v. Trout,* 74 Iowa 545, 38 N. W. 405, 7 Am. St. 499; *Moore v. Commonwealth,* 92 Ky. 630, 18 S. W. 833; *State v. Parks,* 93 Me. 208, 44 Atl. 899; *Commonwealth v. Eddy,* 7 Gray 583; *State v. Grear,* 29 Minn. 221, 13 N. W. 140; *State v. Bell,* 136 Mo. 120, 67 S. W. 823; *State v. Lewis,* 20 Nev. 333, 22 Pac. 241; *Graves v. State,* 45 N. J. L. 347, 46 Am. Rep. 778; *Kelch v. State,* 55 Ohio St. 146, 45 N. E. 6, 39 L. R. A. 737, 60 Am. St. 680; *Commonwealth v. Woodley,* 166 Pa. St. 463, 31 Atl. 202, *State v. Alexander,* 30 S. C. 74, 8 S. E. 440, 14 Am. St. 879; *Carlisle v. State* (Tex. Crim.

App.), 56 S. W. 365; *People v. Dillon,* 8 Utah 92, 30 Pac. 150; *Dejarnette v. Commonwealth,* 75 Va. 867; *State v. Welch,* 36 W. Va. 690, 15 S. E. 419.   The rule in England is followed by the last named class of states. In the states of Oregon and Louisiana the defendant is required by statute to prove insanity beyond a reasonable doubt.   The question presented here was before the supreme court of the territory in *McAllister v. Territory,* 1 Wash. Ter. 360.   The court there said:

"The rule of law as to the burden of proof in criminal cases we all agree is this: The burden is on the territory to make out every material allegation in the indictment beyond all reasonable doubt.   The learned judge who tried the case in the district court repeatedly, in the instructions given on his own motion, and in those asked on the part of the defendant, told the jury that such was the rule of law.   The force and effect of this rule cannot be destroyed by any action of the prosecuting officer so far as the facts constituting the *res gestae* are concerned. Part of the facts included in the *res gestae* may be developed by the territory, and part by the defense, but still the rule is the same.   The defendant is entitled to the instruction that the jury must be satisfied of his guilt beyond all reasonable doubt on all the facts so put in evidence, and so the jury were told, except as shown above. And we are satisfied that so far as the facts attending the killing are concerned—at least so far as these facts are included in the *res gestae,* that the burden of proof never shifts.   This is as true of the defense of insanity under the limitations stated above, as of any other defense.   But if insanity is set up as a separate and distinct defense, and its proof does not consist of the facts attending the killing, then the proof must be made out by the defendant, the legal presumption of sanity being sufficient for the indictment in the absence of evidence to the contrary."

This case is claimed by the appellant as an authority in his favor.   It is also claimed by the respondent as an authority in favor of the state.   The opinion is to the

effect that when the proof of insanity is made as a part of the *res gestae,* the burden of proving insanity is not upon the state; but where the proof does not consist of facts attending the killing, then the burden of proving insanity is upon the defendant. It will be readily seen, therefore, why each side of this controversy claims the case as an authority in its favor. But it is difficult to imagine a case where the slayer is insane and where the proof of insanity is not a part of the *res gestae,* but is independent of the facts attending the killing. The court, however, in that case sustained the conviction upon an instruction substantially as in this case, because it was held that the facts did not warrant any instruction upon the question of insanity, observing:

"The world has had quite enough of that kind of insanity which commences just as the sight of a slayer ranging along the barrel of a pistol, *marks* a vital spot on the body of the victim, and *ends* as soon as the bullet has sped on its fatal mission."

It will be seen, by an examination of the authorities hereinbefore cited, that the cases in the different states are in irreconcilable conflict as to the quantum of proof upon the question of insanity. All, however, concede that the presumption of sanity prevails, and that there must be some evidence to remove this presumption. In the first class of cases, it is held that, where the evidence raises a reasonable doubt as to the sanity of the defendant, he must be acquitted; in the other, that a reasonable doubt is not sufficient, but the defendant must establish insanity by a preponderance of the evidence. In the first class named, the reason for the rule is that the presumption of innocence always attends an accused person, and that the burden of proving all the elements of the offense rests upon the state and never shifts; that, when the defendant's sanity is put

in issue, the state must prove it beyond a reasonable doubt, because, without a mind capable of crime, there can be no crime committed; and, therefore, if the jury entertain a reasonable doubt as to the sanity of the accused, it follows that they are in doubt as to his guilt.

The reason for the rule adopted in the other class of states is that sanity is the natural condition of man, and therefore every man is presumed sane until the contrary is made to appear; that, when the commission of a crime is admitted or clearly proven, and insanity is alleged as a defense, it, being an independent affirmative defense and opposed to the natural and usual order of things, must be established by a preponderance of the evidence. Another reason given is that the presumption of sanity is necessary for the well-being, safety, and protection of society, and for the administration of justice, and neutralizes the presumption of innocence upon which the rule of reasonable doubt rests, and therefore leaves the accused, when asserting his insanity, to show the fact by a preponderance of the evidence. Another reason for the rule is that it is the only safe rule for society, while it is also just to the accused.

The distinction between the quantum of proof necessary to raise a reasonable doubt, and that necessary to constitute a *fair preponderance* of the evidence, is more fanciful than real. When evidence is sufficient to raise a reasonable doubt, as such doubt is usually defined and understood, it may also be said in a sense to preponderate. The distinction, therefore, while it may be fruitful of philosophical and theoretical discussion, is of little practical value. Insanity, when it exists as a fact, is easily and readily proved. When it does not exist in fact, it is easily feigned and difficult to disprove. For this latter reason it is the usual

defense when there is no other. It is no injustice to a defendant to presume that he is sane, and to require him to prove the unnatural condition of mind, which he alleges as a defense for a crime admitted, and to relieve him from a penalty justly due to men in their natural condition. Notwithstanding the weighty reasons advanced by the learned courts in the class first named, we desire to adopt the rule laid down by the trial court in this case.

Appellant assigns error upon the instruction of the court given as follows:

"If you find beyond a reasonable doubt that the defendant committed the crime as charged in the information, then I charge you that it is your duty to render a verdict of murder in the first degree,"

upon the ground that the instruction eliminated the defense interposed. If this instruction is to be read as standing alone, it would be subject to the criticism offered. But all of the instructions must be read together, and, when so read, it was not error, because the court fully and fairly instructed the jury upon the defenses interposed by the defendant. This instruction simply told the jury that the information charged murder in the first degree, which was correct.

Other instructions requested by the appellant—defining the duty of the jury, reasonable doubt, circumstantial evidence, and the degree of insanity necessary to acquit—were refused by the court. These questions were all fully and correctly covered and explained to the jury by other instructions which were given; for that reason it was not necessary to give the instructions requested, even though they stated correct principles of law. A further discussion of them is not necessary.

Appellant's last assignment is that the court erred in refusing to grant a new trial by reason of the insufficiency

of the evidence to justify the verdict. We have carefully examined all the evidence in the case, and, while it is true that no one saw the killing or had an opportunity to see it, except the defendant, the circumstances surrounding the killing are so conclusive that there can be no possible doubt that the defendant did it; that he had prepared for it by taking an ax into the room some time before the deed was done; and that, while Leila Page was asleep or in a drunken stupor, he crushed her skull with the ax and then cut her throat; that he then, with the small pen-knife— probably the same one used on her—and a swallow of carbolic acid, attempted to take his own life; and thereupon became unconscious for a time. There is no evidence of insanity except his own statement hereinabove quoted, and except statements of two or three witnesses to the effect that the day before the tragedy the defendant "looked wild," that he acted "nutty," and "like he was going to get on a drunk." The evidence shows that the defendant was jealous of the deceased, but it is not sufficient to create any sort of a doubt of his sanity; and we have no doubt, upon all the evidence, that, both before and at the time of the crime and afterwards, the defendant was as sane as any man can be who will commit so atrocious a crime. The case was fairly tried, and there is no error in the record.

The judgment is therefore affirmed.

Fullerton, C. J., and Hadley, Anders, and Dunbar, JJ., concur.