## Ortwein *versus* Commonwealth.

1. Under sect. 66 of Act of 31st March 1860 (Criminal Code), the jury, before finding the fact of insanity specially, must be satisfied of it by the evidence.

2. A reasonable doubt of the fact of insanity in a criminal case is not a true basis for the finding of it as a fact, and as a ground of acquittal.

3. The evidence to establish insanity as a defence in a criminal case must be satisfactory, not merely doubtful.

4. A person charged with a crime must be judged to be a reasonable being, until a want of reason positively appears.

5. To make a want of reason to appear, the evidence must be satisfactory, not merely doubtful; nothing less than satisfaction can determine a reasonable mind to believe a fact contrary to the course of nature.

[Ortwein *v.* Commonwealth.]

6. Insanity, as a defence, must be so great as to have controlled the will and taken away the freedom of moral action.

7. When the killing is admitted, and insanity is alleged as an excuse, the defendant must satisfy the jury that insanity actually existed at the time of the act; a doubt as to the insanity will not justify the jury in acquitting.

8. Where a juror had formed his opinion in part from testimony taken before the coroner, as read in the newspapers, and part from rumor, but his opinion was so unfixed that he could hear and determine the case from evidence given on the trial uninfluenced by previous impressions, he was not incompetent.

9. The inquiry as to the juror's incompetency from previous opinion is, whether his opinion is a pre-judgment with such fixedness and strength as would probably influence and control his judgment, or formed upon the same evidence as will be given on the trial.

10. Evidence before a coroner has not the same weight as that given on the trial.

October 12th 1874   Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Error to the Court of Oyer and Terminer of *Allegheny county:* Of October and November Term 1874, No. 210.

Ernest Ortwein alias Mentzger was indicted for murder at the June Term 1874, of the Court of Oyer and Terminer of Allegheny county.

On the 16th of June 1874, his trial commenced before Sterrett, P. J., and Stowe, J., of the Court of Common Pleas of Allegheny county.

In impannelling the jurors the prisoner challenged a number of the jurors for cause; they were severally examined on their *voir dire,* as to whether they had formed or expressed an opinion as to the guilt or innocence of the prisoner. The examination of the jurors having been taken by question and answer, it is desirable to give it as taken.

Alexander McClure said in answer to the above question:—

A. Well, I don't know, for certain, that I ever expressed an opinion.

Q. Have you ever formed one?

A. Well, from reports I had, almost, I suppose, come to a conclusion.

Q. Is that opinion based upon the reading of the testimony taken before the coroner's jury?

A. I read but very little.

Q. Did you read any of it?

A. I read a very little. I bought a paper and brought it home with me for that purpose; on the way home in the wagon, I looked at it a little, but afterwards it got misplaced and I never could find it again. I heard a little of it read from the paper I got, but I didn't hear very much of it read.

Q. By the court.—Was the opinion you entertained formed from reading the testimony taken before the jury, or from outside testimony?

[Ortwein *v.* Commonwealth.]

A. It was from that and rumor.

Q. Both together?

A. Yes, sir. I don't know that I would have come to any definite conclusion from either one separate from the other.

Q. Could'you, with the opinion that you have formed, take your seat as a juror, and try the case under the law and the testimony, without being prejudiced or influenced by that opinion?

A. Yes, sir, I believe I could.

Q. By the prisoner.—Does the opinion that you formed from reading or hearing read a part of the testimony taken before the coroner, as reported in the newspapers, at present exist in your mind?

A. That is the conclusion I drawed from what I read. I only read a portion.

Q. Is that opinion existing in your mind now?

A. Well, I believe it does.

Q. Would it not then require some evidence in order to eradicate that opinion; to remove it?

A. It would take further evidence than I read.

Q. Would it require some evidence now to remove that opinion?

A. I suppose it would.

Q. Would you act upon that opinion as a juror, or, acting as a juror under the law and the evidence, would it have any effect in bringing you to a conclusion as to the guilt or innocence of the prisoner?

A. Well, I don't know that it would.

Q. Do you know that it would not?

A. I believe it would not.

He was challenged for cause; the challenge was overruled, and a bill of exceptions sealed.

The prisoner challenged peremptorily.

William Douglas, in answer to the above question, said:—

Yes, sir, as far as newspaper reports are concerned.

Q. Have you read the report of the testimony taken before the coroner's jury as published in the newspapers?

A. I did, sir.

The prisoner challenged for cause.

Q. By the court.—Is the opinion you formed or entertained, one that would interfere with your rendering a verdict according to the law and testimony, uninfluenced by that opinion?

A. No, sir.

Q. By prisoner.—You say you read the testimony taken at the coroner's inquest, as published in the newspapers.

A. Yes, sir.

Q. The opinion you formed was a consequence of reading that testimony.

A. I was pretty much of one opinion.

[Ortwein *v.* Commonwealth.]

Q. You mean you were of the same opinion before reading it as afterwards ?

A. Yes, sir.

Q. You still hold that same opinion ?

A. Yes, sir.

Q. Would it require some evidence to remove that opinion ?

A. Yes, sir, it certainly would.

Q. By the court.—You state that it would require evidence to remove your opinion ?

A. Yes, sir.

Q. Would that opinion influence you in any degree in rendering a verdict in the case, if you took your seat as a juror, according to the law and the evidence ?

A. No, sir ; it would not.

Q. Were you at the coroner's inquest ?

A. No, sir.

Q. The reports you read were the newspaper reports of the proceedings before the coroner's jury ?

A. Yes, sir.

The challenge was overruled, and a bill of exceptions sealed.

The prisoner challenged peremptorily.

H. Eaton in answer to the question said :

A. In a measure I have. I read a great deal in the newspapers at the time, but I did not read the coroner's inquest.

Q. Does that opinion you say you formed partly remain with you now ?

A. Yes, sir.

Q. Would it require evidence to remove that opinion ?

A. I must have something to remove that opinion.

Q. By the court.—Do you mean that, if you were to take your seat as a juror, the opinion you have would influence you in rendering a verdict ?

A. I would render my verdict according to the law.

Q. Would that opinion you have influence you in rendering your verdict ?

A. I think not, sir.

Q. Then you could take your seat as a juror and act impartially, notwithstanding the opinion you have ?

A. I could.

Q. When you say that it would take evidence to remove the opinion that you have, do you mean that that opinion would influence you as a juror, until you had evidence to remove it ?

A. I think not, sir—not at all.

Q. Still you have an opinion personally as a man, until you change it ?

A. Exactly.

26 P. F. Smith—27

[Ortwein *v.* Commonwealth.]

Q. But as a juror you think you could try the case uninfluenced by it?

A. I am sure I could.

Q. By prisoner.—Did you say that it would require evidence to remove the opinion that at present exists in your mind?

A. I said I must have something to remove this out of my mind. Of course, whatever is in your mind, we must always have something to eradicate it out. I have not made up my mind against this man.

The prisoner challenged for cause.

The challenge was overruled, and a bill of exceptions sealed.

William Smith in answer to the question said:

A. Yes, sir.

Q. Is that opinion formed from reading the testimony taken before the coroner's jury, as published in the newspapers?

A. Yes, sir; reading the testimony before the coroner's jury, and in the newspapers generally.

Q. Are you still of the opinion then formed?

A. Yes, sir.

Q. Would it require evidence to remove that opinion from your mind?

A. Yes, sir, it would.

Q. By the court.—If you were called upon to act as a juror, do you think you would be able to dismiss the opinion you have formed, from your mind, and try the case without reference to it?

A. Well, I believe I could.

Q. Do you think you would if you were called as a juror?

A. Yes, sir.

Q. Unaffected by any opinion now as to the guilt or innocence of the prisoner?

A. Yes, sir.

The prisoner challenged for cause.

The challenge was overruled, and a bill of exceptions sealed.

Oliver S. McIlwaine in answer to the question said:

A. Yes, sir.

Q. How was that opinion formed?

A. From reading the reported account in the newspapers.

Q. You formed your opinion from what report?

A. From the report of the reporter.

Q. Have you that opinion still?

A. Yes, sir, I have.

Q. Would it require evidence to remove that opinion from your mind?

A. Yes, sir, I think it would.

Q. By the court.—Is the opinion you entertain such as you

[Ortwein v. Commonwealth.]

could dismiss from your mind altogether, if you were called upon to act as a juror in this case?

A. Yes, sir, I could.

Q. Do you think, then, if you were required to act as a juror, you would be able to hear and decide the case fairly according to the evidence produced in court, without being prejudiced or affected by that opinion?

A. Yes, sir; I think I could.

Q. By prisoner.—You have stated already that you have an opinion, and that you would require some evidence to remove it. Would it require evidence in the jury-box to remove the opinion that you now have, before you could undertake to sit as an impartial juror?

A. Yes, sir; from the reports I formed my opinion, and it would require something else to remove that.

Q. By the court.—The question is, whether you would be able, if called upon as a juror, to decide this case, unaffected by the opinion you now have, according to the law and the evidence?

A. I could.

Q. Could you dismiss that opinion and try the case without being affected or influenced in your mind by it?

A. Yes, sir; because the opinion is not formed strong enough in my mind; I didn't read it close enough.

The prisoner challenged for cause.

The challenge was overruled and a bill of exceptions sealed.

The juror was sworn.

Robert Neely.

Q. Have you read of the Ortwein case?

A. I have.

Q. Read of it in the newspapers?

A. Yes, sir; some.

Q. Did you read the testimony taken before the coroner's jury, as published in the newspapers?

A. I don't think I read that testimony.

Q. Did you read anything about his confession?

A. Yes.

Q. Have you formed or expressed an opinion as to the guilt or innocence of Ortwein, the defendant?

A. I don't know as I have formed an opinion, but I have expressed one. I have expressed myself in conversation in regard to it.

Q. If you have not formed an opinion, how could you express one?

A. It is the same thing, I know; forming or expressing. It amounts to the same.

Q. Then when you say you have not formed an opinion, but

[Ortwein *v.* Commonwealth.]

expressed one, you mean that expressing an opinion being the same as forming one, you have already formed one?

A. Yes, sir.

Q. Have you that opinion still?

A. Well, I have not been thinking about it; I have not been paying any attention to it at all.

Q. When did you last express that opinion?

A. Oh, it is a good while ago.

Q. Did you express it more than once?

A. More than once; yes, sir.

Q. Did you express more than one opinion?

A. No, sir.

Q. Always the same?

A. Yes, sir.

Q. You think you have not that opinion now?

A. Well, I don't know; I have not been thinking about it for some time.

Q. Have you an opinion now, as to the guilt or innocence of the prisoner, Ortwein?

A. I believe I have an opinion now.

Q. Would it require some evidence to change that opinion?

A. Well, yes; it would.

Q. By the court.—What do you mean by that?

A. I say it would require evidence to change that opinion.

Q. Do you mean, if you were called upon to act as a juror in the case, that that opinion could affect you in the verdict you would render?

A. No, sir.

Q. Then you think you could dismiss from your mind any such opinion as you entertain, and decide by the law and the evidence, uninfluenced by that opinion?

A. Yes, sir; according to the testimony.

The prisoner challenged for cause.

The challenge was overruled and a bill of exceptions sealed.

The juror was challenged peremptorily.

The fourth and fifth points of the prisoner were :—

4. If the jury have a reasonable doubt as to whether the killing was done under an irresistible impulse, the result of a disordered mind, which overpowered the will of the prisoner and took away his power of controlling it for the time, they cannot convict.

5. If the jury have a reasonable doubt of the sanity of the prisoner at the time of the killing, they cannot convict.

The court (Stowe, J.) answered :— .

" The fourth and fifth points are refused and will be more fully considered together. The law presumes sanity, but this presumption may be shaken or absolutely destroyed in some cases by the acts connected with and accompanying the commission of a crime.

[Ortwein v. Commonwealth.]

But before you acquit upon such ground, the evidence, whether arising out of such circumstances or from independent circumstances, must be sufficient to do more than merely raise a doubt as to the prisoner's insanity. It must be sufficient fairly and reasonably to satisfy you of the fact of such insanity. The law does not require proof to an extent to preclude a reasonable doubt of such insanity, but it should be such as to satisfy you from the preponderance of testimony that the prisoner was insane at the time of the killing. As we have heretofore said upon this same subject, in a case which has received the endorsement of our Supreme Court: 'The law of the state is, that when the killing is admitted or proved, and insanity or want of legal responsibility is alleged as an excuse, it is the duty of the defendant to satisfy the jury that insanity actually existed at the time of the act, and a mere doubt as to such insanity, raised by the evidence, will not justify the jury in acquitting upon that ground. The law presumes sanity where an act is done, if no insanity is shown by the evidence; and where it appears a man was sane shortly preceding the act and shortly after, the presumption of sanity exists as to the time of the act, and no jury have a right to assume otherwise, unless the evidence in the cause bearing upon that question fairly convinces them that the defendant was actually insane at the time the act was committed. Having thus indicated to you the amount of evidence required to sustain the defence set up here, the question arises, what do we mean by insanity? In a general sense it means unsoundness of mind, and, medically speaking, comprehends various conditions of the mind arising from various causes having various symptoms and producing different results. All these things we leave to those whose business it may be to study and investigate them. It is sufficient for us to say here and so far as the case is concerned, that it is a condition of the mind which renders it incapable of reasoning or judging correctly of its own impulses, and of determining whether they should be followed or resisted. As said by the present Chief Justice, ' intelligence is not the only criterion, for it often exists in the madman in a high degree, making him shrewd, watchful and capable of determining his purposes, and selecting the means of accomplishment.' Want of intelligence, therefore, is not the only defect to moderate the degree of offence, but with intelligence there may be an absence of power to determine properly the true nature and character of the act, its effects upon the subject and the true responsibility of the action; a power necessary to control the impulse of the mind and prevent the execution of the thought that possesses it. In other words, it is the absence of that self-determining power, which in the sane mind renders it conscious of the real nature of its own purposes and capable of resisting wrong impulses. Where this self-governing power is wanting, whether it is caused by insanity, gross in-

[Ortwein *v.* Commonwealth.]

toxication or other controlling influences, it cannot be said, truth-fully, that the mind is fully conscious of its own purposes, and de-liberates or premeditates the sense of the act describing murder in the first degree. We must, however, distinguish this defective frame of mind from that wickedness of heart which drives the murderer on to the commission of his crime, reckless of conse-quences. Evil passions do often seem to tear up reason by the root and urge on to murder with heedless rage, but they are the outpourings of a wicked nature, not of an unsound or disabled mind. It becomes necessary, therefore, to inquire upon the evi-dence in the case, whether the prisoner was really able to deliberate and premeditate the homicide.

" Now, having stated the principles of law applicable to this case, the facts under the evidence in the cause are yours. The killing is not denied. The accompanying circumstances of time and manner clearly indicate, under a sane condition and the legal re-sponsibility of the prisoner, the highest crime known to the law. The only excuse urged in his behalf is, that he was insane and driven by some irresistible impulse to do the horrid deed. Are you fairly satisfied from the evidence that such was the case ? If you are, it is your duty to acquit; but, if not, it is just as clearly your duty to convict. Of the value of the medical and other evi-dence on behalf of this theory, it is your duty to determine, but I feel it is my duty to say, that in my opinion, such evidence as has been adduced in this respect, ought to be scanned by juries with great care and the utmost circumspection, because the incon-siderate and careless assumption of the sufficiency of such a de-fence as is here set up, would tend inevitably to the justification of every crime which can be committed. If, however, the evidence in this cause, as it is claimed by the counsel for the prisoner, should lead you to honest conviction of the prisoner's insanity, at the time this act was done, it is your duty to give him the full benefit of such conclusion ; but, if it can be fairly and rationally reconciled with his sanity, though it may be unusual and startling and involves a degree of wickedness and depravity horrible to comtemplate, it is your duty to reconcile it and render your ver-dict accordingly."

The jury found the prisoner guilty of murder in the first degree.

The prisoner took a writ of error, and assigned for error, amongst other things, the refusal of the court to sustain his chal-lenges for cause, and the answer of the court to his fourth and fifth points.

*W. D. Moore* and *M. Swartzwelder* (with whom was *F. Luty*), for plaintiff in error.

*T. M. Bayne,* District Attorney, and *R. M. Gibson* (with whom was *T. M. Marshall*), for Commonwealth, defendant in error.

[Ortwein v. Commonwealth.]

Chief Justice AGNEW delivered the opinion of the court, January 4th 1875.

The chief question in this case arises under the fifth point of the prisoner, which was negatived by the court below.   It is this:—

5. If the jury have a reasonable doubt of the sanity of the prisoner at the time of the killing, they cannot convict.

The industry of the able counsel of the prisoner has collected and classified many cases on this point.   While we think their weight accords with our own conclusions, we cannot help perceiving, in their number and variety, that the decision of the question should rest rather on a sound basis of principle than on the conclusions of other courts.   In order to apprehend the true force of the principles to be applied, we must keep in the foreground the facts of the case before any question of insanity can arise.   Insanity is a defence.   It presupposes the proof of the facts which constitute a legal crime, and is set up in avoidance of punishment. Keeping in mind, then, that an act of wilful and malicious killing has been proved and requires a verdict of murder, the prisoner, as a defence, avers that he was of unsound mind at the time of the killing, and incapable of controlling his will; and therefore that he is not legally responsible for his act.   This is the precise view that the statute itself takes of the defence, in declaring the duty of the jury in respect to it.   The 66th section of the Criminal Code of 31st of March 1860, taken from the Act of 1836, provides: "In every case in which it shall be given in evidence upon the trial of any person charged with any crime or misdemeanor, that such person was insane at the time of the commission of such offence, and he shall be acquitted, the jury shall be required to find specially whether such person was insane at the time of the commission of such offence, and declare whether he was acquitted by them on the ground of such insanity."   Thus the verdict must find the fact of insanity, and that the acquittal is because the fact is so found.   The law then provides for the proper custody of the insane prisoner.   This being the provision of the statute, it is evident that a jury, before finding the fact of insanity specially, must be satisfied of it by the evidence.   A reasonable doubt of the fact of insanity cannot, therefore, be a true basis of the finding of it as a fact and as a ground of acquittal and of legal custody.   To doubt one's sanity is not necessarily to be convinced of his insanity. It has been said in a nearly analogous case, "As to whether a reasonable doubt shall establish the existence of a plea of self-defence, I take the law to be this: If there be a reasonable doubt that *any* offence has been committed by the prisoner, it operates to acquit. But if the evidence clearly establishes the killing by the prisoner, purposely, with a deadly weapon, an illegal homicide of some kind is established, and the burden then falls upon the prisoner, and not on the Commonwealth, to show that it was excusable as an act

[Ortwein *v.* Commonwealth.]

of self-defence. If, then, his extenuation is in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some one of its grades—manslaughter at least:" Commonwealth *v.* Drum, 8 P. F. Smith 22. Such also was the opinion of the late Chief Justice Lewis, a most excellent criminal law judge, when president of the Lancaster county Oyer and Terminer, in the trial of John Haggerty, in the year 1847: Lewis's U. S. Criminal Law, p. 402. He said, p. 406: "The jury will decide upon the degree of intoxication, if any existed, and upon the existence of insanity. The burden of proof of this defence rests upon the prisoner; the fact of killing under circumstances of deliberation detailed in this case being established, the insanity which furnishes a defence must be shown to have existed at the time the act was committed. The evidence must be such as satisfies the minds of the jury." Thus, according to both statutory and judicial interpretation, the evidence to establish insanity as a defence, must be satisfactory, and not merely doubtful.

If we now analyze the subject, we shall find that this is the only safe conclusion for society, while it is just to the prisoner. Soundness of mind is the natural and normal condition of men, and is necessarily presumed, not only because the fact is generally so, but because a contrary presumption would be fatal to the interests of society. No one can justly claim irresponsibility for his act contrary to the known nature of the race of which he is one. He must be treated and be adjudged to be a reasonable being until a fact so abnormal as a want of reason positively appears. It is, therefore, not unjust to him that he should be so conclusively presumed to be until the contrary is made to appear on his behalf. To be made so to appear to the tribunal determining the fact, the evidence of it must be satisfactory and not merely doubtful, as nothing less than satisfaction can determine a reasonable mind to believe a fact contrary to the course of nature. It cannot, therefore, be said to be cruel to the prisoner to hold him to the same responsibility for his act, as that to which all reasonable beings of his race are held, until the fact is positively proved that he is not reasonable. This statement derives additional force from the opinion of Chief Justice Gibson in the case of The Commonwealth *v.* Mashler, tried before him and Justices Bell and Coulter, in Philadelphia, and quoted from in Lewis's U. S. C. L. 403–4. "Insanity," he says, "is mental or moral, the latter being sometimes called homicidal mania, and properly so. A man may be mad on all subjects, and then, though he may have a glimmering of reason, he is not a responsible agent. This is general insanity; but if it be not so great in its extent or degree as to blind him to the nature and consequences of his moral duty, it is no defence to an accusation of crime. It must be so great as entirely to destroy his perception of right and wrong, and it is not until that perception is

[Ortwein v. Commonwealth.]

thus destroyed that he ceases to be responsible.    It must amount to delusion or hallucination controlling his will, making the commission of the act, in his apprehension, a duty of overruling necessity."    Again: "Partial insanity is confined to a particular subject, being sane on every other.    In that species of madness it is plain that he is a responsible agent if he were not instigated by his madness to perpetrate the act.    He continues to be a legitimate subject of punishment, although he may be laboring under a moral obliquity of perception, as much so as if he were merely laboring under an obliquity of vision."    And again: "The law is that whether the insanity be general or partial, the degree of it must be so great as to have controlled the will of its subject and to have taken from him the freedom of moral action."    Thus all the utterances of the Chief Justice on this subject are positive and emphatic, and allow no room for doubts, or merely negative expressions.

And if this reasoning were even less than conclusive, the safety of society would turn the scale.    Merely doubtful evidence of insanity would fill the land with acquitted criminals.    The moment a great crime would be committed, in the same instant, indeed often before, would preparation begin to lay ground to doubt the sanity of the perpetrator.    The more enormous and horrible the crime, the less credible, by reason of its enormity, would be the evidence in support of it; and proportionately weak would be the required proof of insanity to acquit of it.    Even now the humanity of the criminal law opens many doors of escape to the criminal.    Then a wider door would be opened by the doubtful proof of insanity made still more open by the timidity of jurors, their loose opinions on the subject of punishment, and their common error that the punishment is the consequence of their finding of the truth of the facts, instead of the consequence of the commission of the crime itself.    The danger to society from acquittals on the ground of a doubtful insanity demands a strict rule.    It requires that the minds of the triers should be satisfied of the fact of insanity.    Finally, we think this point has been actually ruled by this court in the case of Lynch v. Commonwealth, decided at Pittsburg, in 1873.    The prisoner's second point was in these words: "That if the jury had a reasonable doubt as to the condition of the defendant's mind at the time the act was done, he is entitled to the benefit of such doubt, and they cannot convict."    The court below said in answer: "The law of the state is that where the killing is admitted, and insanity or want of legal responsibility is alleged as an excuse, it is the duty of the defendant to satisfy the jury that insanity actually existed at the time of the act, and a doubt as to such insanity will not justify a jury in acquitting upon that ground." This ruling was sustained.    Opinion by Read, C. J.    See Pittsburg Legal Journal 14, 53.

[Ortwein *v.* Commonwealth.]

The assignments of error to the overruling of the prisoner's challenge of jurors for cause are not sustained. We think the court below followed the rulings in Staup *v.* Commonwealth, 24 P. F. Smith 458, and O'Mara and Irwin *v.* Commonwealth, 25 P. F. Smith 424. It is argued that this case is distinguishable on the ground that some of these jurors had formed their opinions in part on the testimony taken before the coroner, as read in the newspapers. But it must be noticed that these jurors did not entertain very positive or decided opinions, and they stated that they were the results of rumor and newspaper statements in part. All were clear that their opinions were so unfixed, they could hear and determine the case on the evidence given in the trial below, uninfluenced by their previous impressions. They did not appear to have prejudged the case, or to have fixed and decided opinions. That evidence would be required to change their first impressions, has but little weight. Such must always be the fact, even in the case of slight impressions or loose opinions. An impression once formed, necessarily exists until something else changes it. The inquiry, therefore, turns upon the character of the opinion. Is it a prejudgment of the case? Has it such fixedness and strength as will probably influence and control the juror's verdict—or has it been formed upon the same evidence substantially as will be given upon the trial? Much weight, therefore, is to be given to the judgment of the court below, in whose presence the juror appears and by whom his manner and conduct, as well as his language, are scrutinized. In relation to the evidence given before the coroner, we may also remark that we do not regard it as having the same weight as the testimony given at the trial of the cause. We know the looseness with which these investigations are generally conducted, especially since the law permitting them to be had before justices of the peace, in lieu of the coroner. We are not now speaking of their legal effect, but of their weight in point of fact, as a basis of a public opinion in which a juror probably participates. In determining its weight in the case of a particular juror, regard will be had in the examination to the real nature and character of the testimony taken before the inquest. In the case of Alexander McClure, a juror, it is said his opinions were denominated by himself as "conclusions," and therefore stood upon a higher ground of exception than mere floating opinions. But a careful examination of his statement convinces us by the word "conclusion," he did not intend to convey the meaning of conclusiveness. It was only a loose use of the word in the sense of opinion, having no fixedness or conclusiveness in his mind.

In none of the assignments of error do we discover a sufficient ground of reversal of the judgment. The sentence of the Court of Oyer and Terminer is, therefore, affirmed, and it is ordered that the record of the case be remitted to the said court for execution of the sentence.