[No. 44675. En Banc. November 17, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. ERLING S. McDONALD, *Appellant*.

*McAdams & Schacht* and *Ronald K. McAdams,* for appellant.

*Arthur R. Eggers, Prosecuting Attorney,* and *Larry Siegel, Deputy,* for respondent.

HICKS, J.—This case presents 10 assignments of error all relating to the insanity defense. Defendant Erling S. McDonald appeals a conviction of two counts of first–degree murder and two counts of first–degree assault for shooting his sister–in–law and her children on May 21, 1975. We affirm the conviction.

Defendant's very able court appointed counsel argues that defendant was insane at the time he committed the acts and therefore should not be held criminally responsible. The specific assignments of error will be considered seriatim after discussion of the facts.

Defendant was arrested in Seattle soon after the shootings, having driven a stolen Greyhound bus from Walla Walla. He was returned to Walla Walla by authorities, where he gave a confession.

A competency hearing was scheduled and defendant was examined on June 26 by Dr. Bruce Jarvis, a court appointed psychiatrist. Dr. Jarvis concluded that defendant was suffering from paranoid schizophrenia and was incompetent to stand trial. Following a competency hearing and order dated July 10, 1975, defendant was committed for 90

days' observation and treatment at the Monroe Mental Health Unit, Monroe Reformatory.

A competency evaluation was filed with the court after 90 days' observation by three mental health professionals at Monroe: psychiatrist R. Longanecker, psychologist William Jones, and psychiatric social worker Paltiell Mitchell. They diagnosed defendant as "chronically and profoundly mentally ill" suffering from "chronic and severe paranoid schizophrenia" manifested by "a rigid and elaborate delusional system," but they concluded defendant was competent to stand trial.

Defendant was returned to Walla Walla and scheduled to stand trial on November 18–21, 1975, subject to another hearing on his competency. At this second hearing Dr. Jarvis, who had reexamined defendant on November 3, disagreed with the Monroe competency evaluation, expressing his belief that defendant was still not competent to stand trial although he may have a "factual understanding" of the proceedings. Dr. Longanecker refused to corroborate the evaluation team's report that defendant was competent, although his signature appeared on the report. He was equivocal and evasive in answering questions regarding his expert opinion as to defendant's competency.

Defendant's counsel, Ronald McAdams, also took the stand at the hearing and expressed his reservations about defendant's competency to stand trial. Mr. McAdams cited defendant's resistance to counsel, his resistance to the suggestion that he was insane or should plead not guilty by reason of insanity, and his belief that he was facilitated in his "mission" by many people and agencies (including Greyhound, which provided a bus with an automatic transmission for defendant to drive to Seattle after the killings, the police who assisted by not stopping him on the way to Seattle, store and motel personnel). Counsel also asserted that defendant felt allegiance to police authorities who assured him he was sane, and resented counsel who attempted to convince him to plead not guilty by reason of insanity, which he eventually did do.

Following this second competency hearing, the trial judge found defendant still incompetent to stand trial and entered an order dated November 5, 1975. The order provided for another 90–day period of evaluation and treatment at the Monroe mental health facility and set the next competency hearing for February 2, 1976.

After 2 more months of treatment at Monroe, Mr. Mitchell and the director of the facility, Dr. McCoy, were convinced defendant was competent. The trial court advanced the February 2, 1976, hearing to January 14, 1976, over defense counsel's objection. In addition to testimony by Dr. McCoy and Mr. Mitchell that defendant was competent, a letter was admitted from Dr. Jarvis, the original court appointed psychiatrist. Dr. Jarvis had examined the defendant for the third time on January 10, 1976, and concluded that defendant was "vastly improved," his psychosis "in significant remission at this time," and that he "is now aware of his peril and has both the capacity and the will to consult with counsel . . . with both rational and factual understanding of the proceedings." At the end of his report, he stated that "this interview with Mr. McDonald came close to being a normal conversation and, if he holds this improvement, he will certainly continue to be competent for the near future." Dr. Jarvis also commented that the difference of opinion between him and the Monroe mental health experts as to defendant's competency in November could have been due to the defendant losing ground after he was sent from Monroe to the Walla Walla jail, where Dr. Jarvis saw him for the second time.

So, on the basis of unconflicting psychiatric testimony, defendant was found competent to stand trial. Proceedings commenced on January 22, 1976, with a CrR 3.5 hearing on the admissibility of defendant's confession of June 6, 1975. The trial court deemed the confession freely and voluntarily given in the presence of defendant's attorney after defendant had received full advice on his constitutional rights.

The next stage in the trial proceedings was a sanity hearing on defendant's motion for acquittal. Dr. Jarvis there testified in accordance with his original observations of June 26, 1975, that defendant was insane at the time of the commission of the crime. Dr. McCoy testified that defendant was sane. Another psychiatrist, Dr. Sol Levy, testified that he had examined defendant on January 29, 1976, and he did not believe him to be mentally ill. He stated that defendant was sane and appreciated the wrongfulness of his conduct at the time of the crime. Mr. Mitchell, the psychiatric social worker from Monroe, then testified that defendant was sane at the time of the commission of the crime, knew right from wrong and knew what he was doing when he committed the crime. The trial court orally denied the motion for acquittal and entered no findings.

Trial before jury commenced February 3, 1976, and, as the defense conceded, the only issue was sanity. The facts of the crime were undisputed. The jury convicted on all counts and defendant was sent to the State Penitentiary at Walla Walla, for two consecutive life terms. Motions were made and denied for a directed acquittal on the basis of defendant's insanity and to have the testimony of Dr. McCoy and Mr. Mitchell stricken because, as adherents to a minority theory of psychiatry called transactional analysis, they failed to apply the *M'Naghten* test in making their determinations.

Defendant's personal history is rife with unresolved conflicts with parents and ex-wives and the internal demons which afflict most of us in some way. The record shows two periods of commitment and a year of private therapy prior to defendant's arrival in the state of Washington. In 1970 he was hospitalized for a nervous breakdown in Maryland. Sometime after that he was jailed for 6 months in Florida for raping his ex-wife, and was then transferred to a mental hospital. The doctors there found him safe to be at large after a short time. He then went to Maryland where he was once again jailed and hospitalized, this time for obstructing

a police officer and carrying a concealed weapon. Once again, he was released after a brief time. He then robbed a bank and came to Washington to kill his sister–in–law for refusing to help him find his ex–wife.

██ Defendant's first assignment of error is based on a misapprehension of RCW 10.77.090. Defendant argues that the statute mandates a full 90–day period for a second incompetency commitment, although the first commitment period need not be for a full 90 days. He asserts that it was error for the trial court to advance the February 2, 1976, hearing to January 14, 1976, thereby depriving defendant of the full 90 days of treatment and evaluation to which he was entitled under the statute.

Subsection 1 of RCW 10.77.090 provides that, if the court finds a defendant incompetent to stand trial the proceedings shall be stayed and the defendant committed "for no longer than a period of ninety days." Subsection 2 provides in pertinent part as follows:

> If the court finds by a preponderance of the evidence that the defendant is incompetent, *the court shall have the option* of extending the order of commitment or alternative treatment for an additional ninety day period, but it must at the time of extension set a date for a prompt hearing to determine the defendant's competency *before the expiration of the second ninety day period.* The defendant, his attorney, the prosecutor, or the judge shall have the right to demand that the hearing on or *before the expiration of the second ninety day period* be before a jury.

(Italics ours.) We read this section of the statute as directory, not mandatory. We said in *Spokane County ex rel. Sullivan v. Glover,* 2 Wn.2d 162, 169, 97 P.2d 628 (1940):

> There is no universal rule or absolute test by which it can be positively determined whether a provision in a statute is mandatory or directory. In the determination of that question, as of every other question of statutory construction, the prime object is to ascertain the legislative intent as disclosed by all the terms and provisions of the act in relation to the subject of legislation, and by a consideration of the nature of the act, the general object

to be accomplished, and the consequences that would result from construing the particular statute in one way or another.

More recent cases reading "shall" as directory rather than mandatory are *Spokane v. Spokane Police Guild,* 87 Wn.2d 457, 553 P.2d 1316 (1977), and *State Liquor Control Bd. v. State Personnel Bd.,* 88 Wn.2d 368, 561 P.2d 195 (1977).

To read RCW 10.77.090 as defendant suggests would frustrate the apparent legislative purpose to allow the trial court "the option" of extending a defendant's commitment until he is competent. The language of subsection 1 clearly indicates the legislature's intent to give the trial court discretion to stay proceedings until defendant is competent, with an outside limit of 90 days. The language of subsection 2 is not so clear in respect to the outside limit of 90 days, but it must be read in conjunction with subsection 1. In so doing, we find no error in the trial court's acquiescing to the urgings of the mental health unit that defendant was competent and the hearing date should be advanced.

The second assignment of error is that defendant's confession should not have been admitted because there was overreaching by police authorities, and defendant was not competent to voluntarily waive his constitutional rights. We find nothing in the record to indicate overreaching on the part of police. In fact, it is apparent that the officers who questioned defendant were careful to caution him beyond what is required of them by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). They did this in response to defense counsel's expressed concern regarding his client's capacity to waive his right to silence. Defense counsel, who was present at the confession, stressed that his client had told him he was working as an agent of the State in committing the killings. At the hearing, held as required by this court in CrR 3.5 expressly for the purpose of determining the confession's admissibility, the officer who took the confession testified as follows:

[A]fter you [defense counsel] had told me this . . . I remember stressing to him or telling him as best I could to try to make him understand I was working for the prosecution; it was my job to investigate this case, and that you were the only one in the room who was there to help him, that you were the one representing his interests, and the only one in the room representing his interests.

The fact that defendant was repeatedly told his *Miranda* rights and voluntarily gave the statement is clear and undisputed. We perceive that the basis for the claim of error is that defendant's confession was *too* voluntary to be intelligent.

■■ However, the trial court, having heard the testimony of the officers and observing firsthand the defendant's demeanor, is in the best position to determine whether defendant had sufficient sensibility and cognition at the time to intelligently waive his Fifth Amendment rights. The court's findings pursuant to the CrR 3.5 hearing were that the confession was not coerced and was freely and voluntarily given. The fact that the confession was intelligently given inheres in this conclusion. The test is whether defendant knew that he had the right to remain silent, not whether he understood the precise nature of the risks of talking. *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967). Defendant understood his right to remain silent sufficiently enough that he remained silent for 15 days. He was taken into custody May 21 and made a taped confession in the presence of his attorney on June 6. It was within the trial court's discretion to admit the confession, and as a reviewing court, we do not substitute our judgment for that of the trial court even if there is conflicting evidence upon which a different conclusion could be reasoned. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

■ Because the two capacity tests differ, we decline to hold as a matter of law that a defendant found incompetent to stand trial is also incompetent to confess to the crime. We are mindful of defendant's previous commitments, but

in examining closely the totality of the circumstances we find the following: (1) he fled after the crime, (2) he used an assumed name, (3) he exercised his right to remain silent for 15 days after he was apprehended, (4) he was given repeated *Miranda* warnings, (5) his counsel was present at the confession, (6) he recalled in detail his crime plans and carried them to fruition as planned, and (7) the trial judge who determined his competency to confess also presided at two of his three competency hearings and at one determined his incompetency to stand trial, which indicates to us that the determinations are not mutually exclusive or contradictory. We also note that competency to stand trial is determined in reference to a different point in time and by a different test. The test for competency to stand trial as set out in many of our cases and in RCW 10.77.090 is whether a defendant can understand the proceedings against him *and* assist in his own defense.

In view of the constitutional magnitude of this assignment of error, we have reviewed defendant McDonald's total record, including medical and criminal history, and are satisfied that the trial court did not err in determining that the defendant had the capacity to waive his right to remain silent and voluntarily did so. The jury ultimately found defendant to be sane, which buttresses the trial court's determination in this matter.

■ Though we find no error in the trial court's determination of voluntariness, it is worth noting that defendant was in no way prejudiced by admission of his confession but in fact utilized the confession in developing his insanity defense. The confession was coherent and detailed, indicating total recollection of the motive and planning of the crime. But references to his victims as enemies of the State, and to himself as an agent of the State, provided the defendant with his only direct evidence of the disturbed thought process upon which he based his defense. Defense counsel acknowledged that the only issue in the case was sanity; the facts of the crime were conceded in the opening

statement and by defendant's witness, Dr. Jarvis. Inadmissible evidence not necessary to support the conviction and utilized by defendant will not constitute reversible error where it cannot be reasonably presumed to have affected the verdict. *State v. Craig,* 82 Wn.2d 777, 784, 514 P.2d 151 (1973).

The evidence of guilt was overwhelming and the confession was not necessary to conviction. It would be fair to say that the defense relied as much as the prosecution on the confession, and the confession was more probative of defendant's thought processes than any element of the crime. Where there is overwhelming evidence of guilt and the appellate court can declare the constitutional error harmless beyond a reasonable doubt, the conviction will stand. *State v. Johnson,* 71 Wn.2d 239, 244–45, 427 P.2d 705 (1967); *State v. Burri,* 87 Wn.2d 175, 182, 550 P.2d 507 (1976). *See also Null v. Wainwright,* 508 F.2d 340 (5th Cir. 1975), holding the admission of a tainted confession harmless error where, on review of the entire record, the court was convinced that the trier of fact would have reached the same result without the confession, and citing *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *Milton v. Wainwright,* 407 U.S. 371, 33 L. Ed. 2d 1, 92 S. Ct. 2174 (1972); *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969).

Defendant next assigns error to the failure of the trial court to find insanity as a matter of law, pursuant to a motion for acquittal under RCW 10.77.080. Defendant was not entitled to such a judgment, and we find his reasoning flawed. He argues that Dr. Jarvis, who examined defendant nearest in time to the crime and testified defendant was insane at the time of his criminal acts, was the only mental health professional whose testimony was probative. In fact, two other psychiatrists and a psychiatric social worker testified on the issue of sanity. There was careful and artful examination and cross–examination of all the experts by both attorneys. The two psychiatrists who examined

defendant sometime after the crime and the psychiatric social worker who was the closest in contact with defendant during his stay at Monroe, all testified that defendant was sane at the time of the crime. Although their testimony was not based on contact as close in time as Dr. Jarvis', it is still probative. The trial court did not abuse its discretion in ruling against defendant.

We are especially convinced of this in reviewing the record. Viewing the evidence in the light most favorable to the prevailing party, the facts of the crime provide direct evidence of defendant's sanity. The crime was well planned and expertly executed. Mr. McDonald came from Maryland by bus to avoid discovery of his gun by airport metal detectors. When he arrived in Walla Walla, he stayed at a hotel near the Greyhound Bus Depot to watch the buses, ride them, learn how to drive them, and learn their schedules. The arrival time of the bus he drove from the scene of the crime was found written on a piece of paper in his hotel room. He went to a hardware store in Walla Walla and bought a tool to get in his sister–in–law's house, in case it was locked. He watched the house for a couple of days to be sure of who was inside, who came and who went. He purchased a mask and surgical gloves to commit the crime. He bleached his hair and went under the assumed name of "Joe Eads" to avert discovery. When he killed his sister–in–law, he also shot her children, intending to eliminate witnesses. He threw away the unspent cartridges before driving away in the Greyhound bus. This is all evidence of calculated premeditation and cunning which the jury was entitled to find substantially outweighed the evidence of insanity. Clearly the trial judge did not err in submitting the issue to the jury. The question of sanity is one of fact and should go to the jury when there is conflicting evidence on the issue.

Further, we find no error in the court's failure to enter findings or conclusions in denying defendant's motion for acquittal. RCW 10.77.080 requires entry of findings only

if the defendant's motion for acquittal is granted. CrR 6.1(c) applies to nonjury trials, not motion hearings.

The fourth and fifth assignments of error are in regard to expert testimony, objected to on the grounds that, (1) a psychiatric social worker with 3 1/2 years of clinical experience in the Monroe Mental Health Unit is not sufficiently qualified to testify as an expert, and (2) mental health professionals who subscribe to minority theories within the psychiatric profession, such as transactional analysis, should not be allowed to testify as their theories are not "accepted" by Washington law.

█ These objections go to the weight rather than the admissibility of the evidence. Admissibility of expert testimony is within the sound discretion of the trial court. The weight to be given the testimony is in the jury's domain. As to minority theorists not subscribing to the *M'Naghten* test, readings of secondary sources make clear the continuing controversy between different schools within the mental health profession. Further, it is clear that no matter what "school" is subscribed to, there will be little or no support for the medically disfavored, but long legally accepted *M'Naghten* test. Some reasons for the disfavor shown *M'Naghten* are the courts' failure under *M'Naghten* to take into consideration emotional "affect," instead defining "know" as being a purely intellectual or cognitive knowledge, the failure to take into consideration the defendant's capacity to control his behavior even if he does know it is wrong (the superego function), and the mental disease or defect definition being too restrictive. *See* A. Morris, *Criminal Insanity,* 43 Wash. L. Rev. 583 (1967–68).

As to a psychiatric social worker not being sufficiently qualified to testify as an expert, whatever he is lacking in professional schooling may be compensated by clinical experience. It is also true that in most clinics the people most in contact with the patients are the psychiatric social workers and other "lesser degreed" individuals. In a state which allows lay testimony as to a defendant's insanity (established in *State v. Brooks,* 4 Wash. 328, 30 P. 147

(1892)), a clinical background and close contact over a period of time with the defendant could qualify one to testify regarding the defendant's sanity. It was clearly within the trial court's discretion to admit the testimony of Mr. Mitchell and Dr. McCoy.

The sixth assignment of error is based on what defendant claims was such a confusion of law on the insanity defense in this state between 1973 and 1976 that the true test could not be ascertained during this trial. Instruction No. 20 was a correct statement of the law on insanity at the time of trial:

> Insanity existing at the time of the commission of the act charged is a defense.
>
> To be found not guilty by reason of insanity the defendant's mind must have been affected by mental disease or defect to such an extent that the defendant was unable to perceive the nature and quality of the act charged *and* was unable to tell right from wrong with reference to the particular act charged.

(Italics ours.)

Defendant discusses at length the amendments made between 1973 and 1974 to RCW 10.77.010, .060, .080, .100. We do not see any difficulty with these amendments and the insanity defense as defined conjunctively by this court (requiring both elements of *M'Naghten* to be proven by defendant by a preponderance of the evidence). In fact it appears that the legislature was simply eliminating restrictive legislative definitions to open up the area to judicial interpretation.

Nevertheless, the law at the time[1] although not evolving

---

[1] The confusion has since been eliminated by the legislature in RCW 9A.12.010:

"To establish the defense of insanity, it must be shown that:

"(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

"(a) He was unable to perceive the nature and quality of the act with which he is charged; *or*

"(b) He was unable to tell right from wrong with reference to the particular act charged.

"(2) The defense of insanity must be established by a preponderance of the evidence." (Italics ours.)

with great clarity, was clearly as stated in the trial court's instruction. *See State v. Thomas,* 8 Wn. App. 495, 507 P.2d 153 (1973), for a discussion by James, J., of the evolution of the test. The critical distinction is that the test is now expressed in the disjunctive as it was originally stated in *M'Naghten's Case,* 8 Eng. Rep. 718 (H.L. 1843).

█ The seventh assignment of error is that the trial court failed to instruct the jury on the effect of finding the defendant not guilty by reason of insanity. The proposed instruction informed the jury that the defendant would be hospitalized at one of the state's facilities for the criminally insane until the court determined he should be released. We find no error in refusing the proposed instruction. Although members of this court have, from time to time, urged instructions similar to that proposed by defendant, a majority of the court has not concurred. For example, *see State v. White,* 60 Wn.2d 551, 602, 374 P.2d 942 (1962), Hunter, J., concurring in part and dissenting in part. The majority of states neither requires nor suggests that the jury be told the consequences of their findings regarding insanity. W. LaFave & A. Scott, *Criminal Law* 316 (1972); Morris, *Criminal Insanity, supra* at 622.

The eighth and ninth assignments of error relate to jury instructions which set forth certain presumptions. Instruction No. 19 told the jury that, since every person is presumed sane and that every sane person is presumed to intend the natural consequences of his acts, the burden of proving insanity as a defense to a crime is on the defendant. That burden must be sustained by a preponderance of the evidence. Instruction No. 10 told the jury that the law presumes that every sane person who kills someone by an act which would naturally and ordinarily produce death presumptively intended that death. Defendant proposed an instruction which would have told the jury that the defendant had the burden of proving insanity by a preponderance of the evidence but once established by that standard, the State must prove sanity beyond a reasonable

doubt. This proposed instruction was refused by the court and is assigned as error by defendant.

Defendant concedes that the instructions given comply with past Washington law. But he argues that the reasoning of *State v. Odom,* 83 Wn.2d 541, 520 P.2d 152 (1974), and *State v. Roberts,* 88 Wn.2d 337, 562 P.2d 1259 (1977), based on *Mullaney v. Wilbur,* 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975), should be extended to the insanity defense. He asserts that the presumption of sanity and the requirement that the defendant prove insanity by a preponderance without then requiring the prosecution to prove sanity beyond a reasonable doubt is an unconstitutional burden on defendant. We do not agree.

The presumption of sanity is as old as the common law and well established in this and every other state. *State v. Clark,* 34 Wash. 485, 493, 76 P. 98 (1904); *State v. Mays,* 65 Wn.2d 58, 66–68, 395 P.2d 758 (1964). It is a presumption grounded in common experience and in our society's most basic traditions of free will and personal responsibility. Further, insanity is an affirmative defense in this state for the defendant to plead and prove by a preponderance. This was established before we were a state. *McAllister v. Territory,* 1 Wash. Terr. 360 (1872). The jury must have more than a reasonable doubt as to a defendant's sanity in order to acquit him. *State v. Clark, supra.* The requirement has continued to be affirmed by this court, *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957), and now it is codified in RCW 9A.12.010 and 10.77.030. As stated by the Pennsylvania Supreme Court, "[m]erely doubtful evidence of insanity would fill the land with acquitted criminals." *Ortwein v. Commonwealth,* 76 Pa. 414, 425 (1874).

We do not think this requirement of proof in any way emasculates the requirement that the prosecution prove every element of the crime beyond a reasonable doubt. Sanity is not in itself such an element. Therefore, we choose not to join the federal courts and a minority of state courts (*see* 17 A.L.R.3d 146, 158–59 (1968)) in allowing the defendant to produce only some evidence of insanity

thereby meeting the burden of production and causing the burden of persuasion to shift to the prosecution to prove sanity beyond a reasonable doubt. *See* 9 J. Wigmore, *Evidence* § 2483 (3d ed. 1940) for a development of this difficult area.

The approach argued by defendant is not constitutionally mandated.[2] From the United States Supreme Court's most recent expression on this matter, *Patterson v. New York*, 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977), it is apparent that *Mullaney* reasoning is not applicable to the affirmative defense of insanity.

We also uphold the presumption of sanity and find that it was validly applied to defendant under the circumstances of this case. Evidence of prior criminal insanity commitments in other states, which resulted in defendant's release after he was deemed sufficiently recovered, does not merely by its introduction eradicate the presumption of sanity. The reason for this is grounded in common experience, and this state's policy exemplified by our criminal insanity test and our requirement that insanity be established as an affirmative defense.

It must be remembered that our test for insanity, the *M'Naghten* test, is very rigorous. This court has held that only those persons "who have lost contact with reality so completely that they are beyond any of the influences of the criminal law," may have the benefit of the insanity defense in a criminal case. *State v. White, supra* at 590. Those who are commonly regarded as "odd" or "unsound"

---

[2]Mr. Justice Rehnquist's concurring opinion in *Mullaney*, states at page 705:

"I agree with the Court that *In re Winship*, 397 U. S. 358 [25 L. Ed. 2d 368, 90 S. Ct. 1068] (1970), does require that the prosecution prove beyond a reasonable doubt every element which constitutes the crime charged against a defendant. I see no inconsistency between that holding and the holding of *Leland* v. *Oregon*, 343 U. S. 790 [96 L. Ed. 1302, 72 S. Ct. 1002] (1952). In the latter case this Court held that there was no constitutional requirement that the State shoulder the burden of proving the sanity of the defendant."

In *Leland*, the Oregon statute (since repealed) required defendant to prove his insanity *beyond a reasonable doubt.* Our requirement of a defendant is proof by a preponderance of the evidence.

or even "deranged" would not normally qualify. Many, if not most, mentally ill persons presently being treated in the mental institutions of this state who are there under the test of "likelihood of serious harm to the person detained or to others," (RCW 71.05.230(1)) would not meet the *M'Naghten* test, if charged with a crime.

Regarding the presumption of sanity and other matters concerning the defense of insanity, the judges in *M'Naghten's Case, supra* at 722–23, speaking through Lord Chief Justice Tindal, responded to questions propounded to them in the House of Lords. Lord Tindal's remarks seem particularly appropriate to this case and they are set forth in part as follows:

> Your Lordships are pleased to inquire of us, secondly, "What are the proper questions to be submitted to the jury, where a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons, is charged with the commission of a crime (murder, for example), and insanity is set up as a defence?" And, thirdly, "In what terms ought the question to be left to the jury as to the prisoner's state of mind at the time when the act was committed?" And as these two questions appear to us to be more conveniently answered together, *we have to submit our opinion to be, that the jurors ought to be told in all cases that every man is to be presumed to be sane,* ˆand to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

(Italics ours.)

We hold that the instructions considered as a whole do not attenuate the fundamental presumption of innocence or the requirement that the State prove every element of a crime beyond a reasonable doubt.

 Finally, as error No. 10, the defendant contends that the word "substantial" should not have been used together with the word "doubt" in explaining the court's reasonable doubt instruction. He cites federal cases in support of his position. *United States v. Alvero,* 470 F.2d 981 (5th Cir. 1972); *United States v. Atkins,* 487 F.2d 257 (8th Cir. 1973); *United States v. Kirk,* 496 F.2d 947 (8th Cir. 1974). The instruction given by the court has been stock in this state for many years, and with the continual reiteration of reasonable doubt language, and the description of what a reasonable doubt is, it is unlikely that the jury was in any way misled by the one–time use of the term "substantial doubt." The jury is instructed to view the instructions as a whole. On review the challenged instruction must be read in conjunction with all others. *State v. Thompson,* 88 Wn.2d 518, 564 P.2d 315 (1977). In so doing, we find no error, though a better instruction might not include the word "substantial." In any event, in this case it is academic. There can be no prejudice as regards an instruction on the state's burden to prove every element of crime beyond a reasonable doubt where the defendant has admitted the acts, but relies on the defense of insanity.

Affirmed.

WRIGHT, C.J., ROSELLINI, HAMILTON, BRACHTENBACH, and HOROWITZ, JJ., and HENRY, J. Pro Tem., concur.

UTTER, J. (concurring)—I concur in the result reached by the majority; however, I cannot subscribe to the treatment afforded the admission of the defendant's confession. As I understand the majority opinion, it upholds the admission of the challenged confession on two grounds. The opinion asserts the admission of the confession was not prejudicial because the facts pertinent to the commission of the crimes charged were conceded to be true at the time of trial and the confession was utilized by the defense in attempting to establish the defendant was not guilty by reason of insanity. This discussion is dispositive of the issue raised and I

am in agreement with it. The majority also contends, however, that the confession was admissible on the basis the defendant "knew he had the right to remain silent." In so holding the majority improperly states the recognized constitutional test for the validity of confessions. The test established by the United States Supreme Court and acknowledged by this court requires not only that the defendant be informed of and understand his right to remain silent, but also that the decision to waive the right to silence be intelligently made. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966); *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964); *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967) (*vacated and remanded on other grounds, Wheat v. Washington,* 392 U.S. 652, 20 L. Ed. 2d 1357, 88 S. Ct. 2302 (1968)).

The record indicates that at the time of giving the challenged confession, the defendant felt he had been functioning as an agent of the State in committing the crimes charged and would never be brought to trial. He also felt the interrogating officers to be his allies and was suspicious of the motives of his counsel. It is difficult to comprehend how one who was in fact operating under such a delusion could intelligently elect to confess his crimes. The majority's suggestion that knowledge of the right to remain silent, standing alone, establishes an adequate foundation for a valid confession is inconsistent with established constitutional principles and unnecessary to the resolution of the issue raised.

STAFFORD, J., concurs with UTTER, J.

Petition for rehearing denied March 29, 1978.